## NATIONAL LABOR RELATIONS BOARD v. LINK-BELT COMPANY.*

No. 235.  Argued December 18, 1940.—Decided January 6, 1941.

---

*Together with No. 236, *National Labor Relations Board* v. *Independent Union of Craftsmen*, also on writ of certiorari, *post*, p. 629, to the Circuit Court of Appeals for the Seventh Circuit.

*Mr. Robert B. Watts,* with whom *Solicitor General Biddle, Assistant Solicitor General Fahy,* and *Messrs. Thomas E. Harris, Laurence A. Knapp,* and *Morris P. Glushien* were on the brief, for petitioner.

*Mr. Henry E. Seyfarth,* with whom *Mr. Herbert Pope* was on the brief, for respondent in No. 235.

*Mr. Benjamin Wham* for respondent in No. 236.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The court below refused to enforce certain portions of an order of the National Labor Relations Board, entered in proceedings[1] under § 10 of the Act (49 Stat. 449), requiring an employer to cease and desist from dominating or interfering with a labor organization and to withdraw recognition from it as a collective bargaining representative of employees; and directing the employer to reinstate or to make whole certain employees[2] against whom the Board found the employer had discriminated because of their union membership and activities. Enforcement of those portions of the order was refused because, in the view of the court below, they were not

---

[1] These proceedings were instituted on charges filed in 1937 and 1938 by Lodge 1604 of Amalgamated Association of Iron, Steel and Tin Workers of North America, affiliated with the Steel Workers Organizing Committee, and through it with the Committee for Industrial Organization. The complaint, as amended, charged that the employer, respondent in No. 235, had engaged in unfair labor practices within the meaning of § 8 (1), (2), and (3) of the Act; 29 U. S. C. § 158 (1), (2), and (3). Independent Union of Craftsmen, respondent in No. 236, was allowed to intervene, was represented by counsel and participated throughout the proceedings.

[2] The Board did not sustain the charges that certain other employees had been discharged because of their union activities.

"supported by evidence" as required by § 10 (e) of the Act. The petition for writs of certiorari was granted because of the importance in an orderly administration of the Act of the mandate contained in § 10 (e) that the findings of the Board as to the facts "if supported by evidence, shall be conclusive." See *National Labor Relations Board* v. *Waterman Steamship Corp.*, 309 U. S. 206.

*Disestablishment of Independent.* Independent Union of Craftsmen was organized within a few days after the decision by this Court, on April 12, 1937, of *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, which upheld the constitutionality of the Act. From 1933 down to that date the employer, Link-Belt Co., had maintained a company union, apparently continuing to recognize it even after passage of the Act in 1935 and even though under the Act it was concededly an improper bargaining unit. In any event, that union remained in existence until Independent's membership drive was successfully concluded. The organization of Independent was conceived on April 12 and 13, 1937, by certain employees, who were disappointed at the decision upholding the constitutionality of the Act. Linde, who was a leader in organizing Independent, testified: "A. The Wagner Act had been declared constitutional, and a group of us were dismayed, I am frank to admit, or we thought there was nothing for us to do. Q. Why were you dismayed? A. I will tell you, we had banked our hopes that it would be declared illegal, and immediately the labor unrest and trouble would have stopped and our company would proceed and all the other companies would proceed to enjoy the prosperity which we thought was coming at that time." The membership drive took place in the main on April 14, 15, and 16, resulting in a membership of 760 out of about 1,000 employees. The constitution was drafted on April 17. On April 18, it

was decided to seek dissolution of the old company union and recognition of Independent. Accordingly, on April 19 an agreement was reached between the employee representatives and plant manager Berry dissolving the old union; and he was asked to obtain exclusive recognition for Independent. That request was granted by the employer on April 21; and Independent held its first meeting on April 22.

An "inside" union, as well as an "outside" union, may be the product of the right of the employees to self-organization and to collective bargaining "through representatives of their own choosing," guaranteed by § 7 of the Act. The question here is whether the Board was justified in concluding that Independent was not the result of the employees' free choice because the employer had intruded to impair their freedom.

Respondents point to numerous earmarks of independence which Independent evidences. They emphasize that after it was recognized it held many bargaining conferences and as a result obtained wage increases, changes in seniority policy, bonus payments for night workers, a better vacation policy, better lighting and air conditions, and improved safety measures—in fact, all of its major objectives except a closed shop. They stress the facts that it is not financed by the employer, that its meetings are held off company property, that its leadership is substantially different from the employee representation in the old company union, and that its genesis was a suggestion made not by the employer but by a group of employees.

In the latter connection they urge that the employees chose Independent because that was the type of labor organization which they honestly preferred; or as stated by one of the employees who led the membership drive, "It was so big a feature that they (the employees) were all anxious to get on the band wagon and do something.

That was the general attitude." And they maintain that there was in fact no connection between Independent and the old company union; that the success of Independent's membership drive was not the result of and compulsion or belief as respects the employer's attitude.

It would indeed be a rare case where the finders of fact could probe the precise factors of motivation which underlay each employee's choice. Normally, the conclusion that their choice was restrained by the employer's interference must of necessity be based on the existence of conditions or circumstances which the employer created or for which he was fairly responsible and as a result of which it may reasonably be inferred that the employees did not have that complete and unfettered freedom of choice which the Act contemplates.

Here no one fact is conclusive. But the whole congeries of facts before the Board supports its findings.

The employer's attitude towards unions is relevant. As we have indicated, it maintained a company union both before and after the Act. And the court below sustained the Board's finding as to the employer's long-standing industrial espionage, through the National Metal Trades Association, which continued at least until an investigation was made late in 1936 by the La Follette Committee of the Senate.[3] Further, the employer evidenced hostility towards an "outside" union. In 1936, plant manager Berry told the board of the company union that "in the event outside people came into our plant and told us how to run the plant, then I had enough of industry." At the hearing he testified that he meant "that the Link Belt Company was able and had

---

[3] Subcommittee of the Committee on Education and Labor, United States Senate, of which Senator Robert M. La Follette, Jr., was Chairman. This Subcommittee acted pursuant to S. Res. 266, 74th Cong., 2d Sess., and held extensive hearings beginning in 1936.

for many years ran their organization and we did not need outside people to tell us how to run the plant economically and efficiently." In September, 1936, Salmons, an employee of 14 years standing, who was an employee representative in the company union and who became dissatisfied with it, initiated the formation of Amalgamated, an "outside" organization.[4] Amalgamated held its first organizing meeting on September 20, 1936. Salmons was discharged the next day by plant manager Berry for "spreading union propaganda around here." He was given half an hour to leave. The employer does not deny this but adds that Salmons was discharged because he engaged in union activities on company time. That he did solicit on company time seems clear, though it could hardly have been extensive as his foreman testified that he was not aware of it. Yet in his association with the company union, he apparently was allowed a similar freedom. That fact, his position of leadership in Amalgamated, the apparent absence of the customary warning, his somewhat precipitate discharge, the failure of the employer to discharge representatives of Independent who, as we shall see, solicited on company time with the knowledge and approval of at least some of the supervisors, made permissible the Board's conclusion that Salmons' activity on behalf of the "outside" union was the basic cause of his discharge.[5] On September 21, 1936, another employee, Novak, who had been employed by the company for over 11 years, was also discharged without warning by Berry, who believed, mistakenly it would seem, that Novak was a member of and solicitor

---

[4] See note 1, *supra*. Amalgamated apparently had about 400 members before Independent started its membership drive in April, 1937.

[5] Salmons was rehired on December 21, 1936, after mediation by the Board on the understanding that he would not engage in union activities on company time.

for Amalgamated. Berry gave him half an hour to get out, after charging him with being "an organizer and instigator for a union"—a charge which Novak denied.[6] The Board found and the court below sustained the finding that Novak was discharged in violation of the Act because of his alleged union activities. We agree.

Amalgamated, as well as Independent, solicited on company time. But a review of the record indicates that the instances of solicitation by Amalgamated on company time were scattered over a period of months and were apparently more sporadic than those of Independent. At least they do not appear to have had the magnitude and intensity of the acts of solicitation on company time by Independent. There is considerable testimony by members of the supervisory staff that they were instructed not to take sides in the union competition and not to allow solicitation on company time. Plant manager Berry testified on direct examination that those instructions were given after April 12, 1937; and on cross-examination he admitted that they were given only after April 19, 1937, at which time Independent had acquired a membership of 760 men. It is argued here that the employer warned solicitors for Independent and threatened them with dismissal for engaging in union activities on the company's time. And Froling, chairman of the company union and active solicitor for Inde-

---

[6] Novak was reinstated in January, 1937, with the understanding that he would not engage in union activities on company time. According to him, the condition extended to union activities at all times. According to the company, it covered only union activities on company time. The Board did not resolve the conflict but noted that Novak as a result of his understanding, did not join Amalgamated until after the Act had been upheld in April, 1937. Novak delayed accepting the proposal of reinstatement because of the possible implication that thereby he would tacitly admit that he had earlier engaged in union activities.

pendent, testified that he was wary about soliciting in the plant on company time in front of foremen, for although he did not remember any foreman warning him, he nevertheless was afraid of being discharged because of what had happened to Salmons on account of his activities. It is therefore contended that no discrimination in favor of Independent can be inferred; that the quick success of Independent in obtaining a majority was due not to the employer's support but to the employees' enthusiasm for that union. The Board stresses the fact that employee representatives in the company union were extremely active solicitors for Independent. It points out that at least six of the employee representatives under the company union were active solicitors—Froling virtually admitting that he solicited the entire machine shop—110 to 120 men—during working hours. Kowatch, an employee, signed up between 100 and 250 men, about one-fourth on company time and twice punched out his time with the permission of the foreman to solicit in the foundry. The company counters with the fact that there were many solicitors for Independent of whom those representatives were a mere minority—less than a third. There is this to be said, however, about those conflicting claims. Most of the company union representatives were active and prominent in Independent's membership drive and during that drive apparently enjoyed somewhat the same privilege of moving freely about the plant which they had been allowed as company union representatives—a privilege withdrawn after Independent had been recognized. The instances when supervisors remonstrated with solicitors for Independent seem to be restricted to around six or seven in number, and some of those related to activities *after* the April membership drive was completed. As respects one of the latter instances, Linde, an employee soliciting for Independent, stated that foremen warned the men: " 'You are on union

business. My God, don't let me catch you or we will fire you,' or words to that effect." But, as the Board concluded, it seems impossible to infer that, in view of the extensive and intensive solicitation for Independent in the plant on company time, the supervisory staff were not aware of the campaign and did not acquiesce in it. Beyond that is the active support of Independent by some of the supervisory staff. There is abundant testimony that Siskauskis, a foreman, actively solicited for Independent. One employee, Lackhouse, who earlier had joined Amalgamated but who was soliciting for Independent in April 1937, testified:

"He took the sheets in my hand—the first sheet I had already filled, with the heading on it, and I had nothing but blank sheets left, and he went around the machines, the molders right off the side floor there, and he told them to sign up for the Inside union here, and he signed up I believe ten, and about five of them he signed up in his own handwriting. The majority of them in the foundry don't know how to write. Q. And did you see him sign up these other men? A. I seen him sign up actually about seven or eight, I am sure, in his own handwriting. He went as far as one crane man who was working right above him, and he was going up to him and he was going to explain what it was all about, and he says, 'Oh, heck, he don't know how to write,' so he wrote down his name, too. I don't remember his name, I know it was John, the crane man in his department. I just don't know his last name. Q. And then did Mr. Shaskinskis (sic) give you back the paper? A. Yes, he returned them back to me after he had the names on them."

This episode was confirmed at least in part by Johnson, an employee.

Another employee, Balcauski, testified as follows respecting Siskauskis' solicitation:

"He walked to me and he said, 'Stanley, why don't you join in the C. I. O.'—I mean this here, the independent craftsmen's union. I said, 'I am already with the C. I. O.' He says, 'The hell with the C. I. O.' He says, 'Join in with the craftsmen's union.' He says, 'We are going to have our union.' Then I repeated, I says, 'Do you know under the Wagner Law that is not allowed for the foreman to go and organize the workingmen on the company time or on his own time?' He told me this, he said, 'To hell with that.' So I says, 'If you want to sign up independent, go ahead, I ain't going to waste my time.' And I walked away."

Balcauski further testified respecting Siskauskis' solicitation of employees: "He told them, 'If you don't sign up'—I heard it with my own ears—he said, 'you are going to get out of here.' "

Still another employee, Thomas, testified:

"Q. Did anybody ask you to join the Independent Union? A. Everybody, Splitz (Siskauskis) comes to me with piece of paper, sign your name. I say I can't sign my name. He says, 'All right, I sign it myself.' And he signed it himself, my name. Q. Did he say anything more to you about it? A. That is all that day. The second day he come around again. He say, 'Joe, sign name.' I say, 'I sign yesterday.' He say, 'All right, it is no good, I threw it away.' Q. It is no good, he threw it away? A. Sure. I didn't sign no place. 'Joe,' he say, 'Sign him up anyhow, or maybe lose job.' Q. Splitz says to sign up or maybe you lose job? A. Yes. I says, 'I sign him up if you want to.' He come in Thursday about this piece of paper again and he say, 'Joe, sign name.' I say, 'What is the matter, I sign him up twice, I sign him up before yesterday and I sign him again.' He say, 'Something wrong, no good.' I say, 'I quit, I don't want sign at all.' Q. You didn't want to sign? A,

No. Q. You didn't sign either day? A. I don't sign. At noontime he come to me and he say—I was by him over there and he say, 'Come on, Joe, come in office sometime, we want to see you.' Q. Did you go in the office? A. Yes. . . . Q. Some man with a mustache was sitting there? A. Yes, sir. He says, 'What you want?' I say, 'Splitz sent me in office, you want something?' He said he didn't want nothing from me. Splitz come in then and grabbed my hand, and he say, 'Give him piece of paper.' He say, 'sign his name.' I can't sign name, I say I will not sign. I said two times I sign, I don't like it. He say, 'Sign anyhow.' Q. Who said that? A. Splitz, 'Go ahead, sign again.' I say, 'I am going out, go to work.' Q. You did not sign? A. No. A couple of times he come to me and say, 'Sign them up.' I don't sign no place. A lot of people don't sign, I no sign."

Bozurich, an employee, testified as follows with respect to the attitude of Siskauskis towards Amalgamated:

". . . then he went on with remarks that it would be very bad if C. I. O. would come into the shop. And I said, 'What would be bad about it?' I said, 'If the workers want it who can stop them?' 'Well,' he said, 'if C. I. O. comes in the company will close the plant.' He said, 'You see during the depression it was hard to be without a job.' I said, 'Company can't lock—close the shop because of the union.' I says, 'That would be considered as a lock-out.' And he said, 'Who can stop them?' 'Well,' I said, 'the government.' He said, 'The company runs the plant and not the government.' I said, 'There is such a thing as government Labor Board here who takes care of those members,' and I believe I referred him to—well, to be exact, I read in the paper about a certain company somewhere in New York or New Jersey that due to C. I. O. activities closed their plant and

moved the machinery out, things like that, to get away from the union. So I call his attention to that, to the best of my recollection from the newspaper, that the Labor Board takes action; they got company to put machinery back. At least that is the way I understood it so the illustration to him is that we are not afraid of that kind. Then he twisted his lips and said 'Oh,' he says, 'you better keep away from something like that,' he said, 'and if you want anything it is best to go to boss yourself.' "

There is also testimony that Siskauskis signed for illiterate employees, though, with one possible exception, apparently not against their will. Siskauskis denied that he made any such statements or that he ever solicited for Independent. The Board refused to believe that all the opposing testimony was fabricated, and found his denials unconvincing.

Lackhouse, an employee, testified that he obtained permission from Nyberg, his foreman, to solicit for Independent, Nyberg saying, "Well, if you have to, you have to, Frank, so you might as well go ahead on it." Lackhouse was delayed about half an hour in getting started when Olson, an assistant superintendent, took him aside in a separate room and, according to Lackhouse, "compared the differences between the outside union and the inside union; and he told me about it up there, how much better off we would be if we organized amongst us fellows, among our fellow workmen ourselves and kept the outside union out, that you will never get anywhere with them, just striking all the time, and give me the differences, and I listened to him about it." Lackhouse testified that thereupon he solicited in the plant during working hours: "I was absent from my job from one o'clock until quitting time walking through the whole foundry." On direct examination Olson denied this

conversation. On cross-examination he admitted talking briefly with Lackhouse about "a rumor that the boys are trying to form an independent union." Nyberg was not called. The Board believed Lackhouse.

There was considerable testimony, not denied, that Belov, a night boss, also solicited for Independent. According to one employee, Kalamarie, Belov did so on written instructions left by foreman McKinney which Kalamarie read. Kalamarie testified as follows respecting this conversation with Belov about those instructions:

"Q. So when he (Belov) got this note to solicit for the Independent Union he was a little bit puzzled by it and he asked your advice about it? A. He did. Q. You advised him that inasmuch as his superior officer, Mr. McKinney, had ordered him to do it, he had better go ahead and do it? A. That is right, if he wanted to keep his job, I imagine he should."

McKinney denied that he had left any such instructions, though it apparently was his custom to leave written instructions for the night bosses on things he wanted done. Belov was not called. Because of that and because of the contradictory character of McKinney's testimony on certain matters, the Board believed Kalamarie.

Tomas, an employee, testified that his boss, Big Louie, "a kind of assistant foreman," solicited for Independent getting about ten signatures; that Big Louie told him that "they were trying to get the C. I. O. out of there."

The court below was unable to find any evidence from which it could be inferred that the employees did not, with complete independence and freedom from domination, interference or support of the employer, form their own union. But we are of the opinion that

the Court of Appeals in reaching that conclusion substituted its judgment on disputed facts for the Board's judgment—a power which has been denied it by the Congress. Sec. 10 (e) provides that the "findings of the Board as to the facts, if supported by evidence, shall be conclusive." As we stated in *National Labor Relations Board* v. *Waterman Steamship Corp., supra,* at pp. 208–209: ". . . Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act." Congress entrusted the Board, not the Courts, with the power to draw inferences from the facts. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 271; *National Labor Relations Board* v. *Falk Corp.,* 308 U. S. 453, 461. The Board, like other expert agencies dealing with specialized fields (see *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 146; *Swayne & Hoyt* v. *United States,* 300 U. S. 297, 304) has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony.

The Board had the right to believe that the maintenance of the company union down to the date when Independent's membership drive was completed was not a mere coincidence. The circumstantial evidence makes credible the finding that complete freedom of choice on the part of the employees was effectively forestalled by maintenance of the company union by the employer until its abandonment would coincide with the recognition of Independent. The declared hostility towards an

"outside" union, the long practice of industrial espion-
age, the quick recognition of Independent, the support
given Independent's membership drive by some of the
supervisory staff, the prominence of company union rep-
resentatives in that drive, the failure of the employer
to wipe the slate clean and announce that the employees
had a free choice, the belated instructions to the super-
visory staff not to interfere—all corroborate the conclu-
sion that the employer facilitated and aided the substi-
tution of the union, which it preferred, for its old company
union. But respondents contend that there is no
evidence that the employees had a settled conviction
that the employer preferred a certain type of labor or-
ganization or that they were under compulsion from the
employer in choosing between Independent and Amal-
gamated. There were, however, forces at work in the
plant which make tenable the conclusion of the Board
that the employer had intruded so as effectively to re-
strain the employees' choice. The employer's attitude
towards an "outside" union coupled with the discharge
of Salmons and Novak for activities on behalf of Amal-
gamated would tend to have as potent an effect as direct
statements to the employees that they could not afford
to risk selection of Amalgamated. That the discrimina-
tion against Salmons had some effect is not denied, for
Froling, a witness for Independent, insisted that even he
furtively solicited for Independent because of the price
paid by Salmons. When that discrimination is con-
trasted to the apparent acquiescence by the management
in the open solicitation by Independent, we cannot say
that the Board was unjustified in the conclusion which
it drew. As we stated in *International Association of
Machinists* v. *National Labor Relations Board*, 311 U. S.
72, 78, "Slight suggestions as to the employers choice be-
tween unions may have telling effect among men who

know the consequences of incurring that employer's strong displeasure." Nor does the Board lack the power to give weight to the activities of some of the supervisory employees on behalf of Independent, even though they did not have the power to hire or to fire. As we indicated in *International Association of Machinists v. National Labor Relations Board, supra,* the strict rules of *respondeat superior* are not applicable to such a situation. If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere. If the employees "would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." *International Association of Machinists v. National Labor Relations Board, supra.* Here such inferences were wholly justified. The attitude of the employer towards an "outside" organization was clearly conveyed. When that was followed by solicitation for Independent on the part of supervisors who had general authority over the men, it would be unfair to conclude that the employees did not feel an actual pressure from the management. That fact, the failure of the employer to announce its impartiality, its delay in advising the supervisors to remain neutral until Independent had acquired its majority, the favors shown Independent, the discharge of Salmons and Novak, its past union policy, all are part of the imponderables which the Board was entitled to appraise. The fact that these various forces at work were subtle rather than direct does not mean that they were none-

theless effective. Intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge.

Respondents suggest that an order of disestablishment would make Independent an innocent victim of the employer's inaction or of its unwelcome action. It is urged that the subsequent conduct of Independent demonstrates its independence and that an order directing the employer to cease and desist all interference with the employees and with Independent is wholly adequate for the evil at hand. The Board, however, was not forced to conclude that the subsequent activities of Independent erased the effects of the employer's earlier discrimination, any more than it was compelled to believe that the employer's later show of impartiality obliterated the consequences of its prior interference with the employees' freedom of choice. We cannot assume that the employees will be free from improper restraints and will have the complete freedom of choice which the Act contemplates where the effect of the unfair labor practice is not completely dissipated. The Board not the courts determines under this statutory scheme how the effect of unfair labor practices may be expunged. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines, supra; National Labor Relations Board* v. *Bradford Dyeing Assn.,* 310 U. S. 318; *International Association of Machinists* v. *National Labor Relations Board, supra.*

The order of disestablishment must be enforced.

*Discharges of Employees.* The court below rejected the finding of the Board that Salmons had been discharged in violation of § 8 (1) and (3) of the Act. For the reasons already stated, we think that the court erred and that the Board was right.[7]

---

[7] The Board ordered no affirmative relief with respect to Salmons as he had been reinstated under an agreement with the company that he would not receive back pay.

The Board found that in April, 1937, employment manager Staskey conditioned the employment of Frank Solinko upon the acceptance of membership in the Independent by his father, Pete Solinko; and that therefore the company had violated § 8 (3) of the Act.[8] The Board credited the testimony of Pete and Frank Solinko against testimony of Staskey and an employee named Kowatch. Kowatch was a solicitor for Independent whom Pete Solinko said Staskey had told him to see. Pete, a member of Amalgamated, joined Independent. So did Frank, who later, however, joined Amalgamated. The evidence is somewhat confusing. But even according to Staskey, Pete Solinko did show him an Independent card the day Frank was hired. The court below noted that even if the testimony of Pete were true, the conversation occurred two months before Frank was hired; and even if it took place on the day he was hired, then it was after Independent had been recognized by the company as the bargaining agent for the employees. We think, however, that the Board's finding was justified. Whenever the conversation took place, the conditioning of Frank's employment upon Pete's joining Independent was a violation of § 8 (3) of the Act in absence of a valid closed-shop agreement, not present here. Viewed in that light, it also corroborates the conclusion of the Board that the employer interfered with the collective bargaining process by supporting Independent, though the episode took place after Independent's membership drive was completed.

Karbol and Cumorich were discharged May 19, 1937. In April, 1937, Belov, according to their testimony, had asked them to join Independent. They refused. In the latter part of April, 1937, they joined Amalgamated.

---

[8] No affirmative relief was ordered as respects Pete Solinko, who was laid off in January, 1938.

The company's claim is that they were discharged for unsatisfactory work after time studies had shown their inefficiency and after the day foreman, McKinney, had warned them that their work was not satisfactory. On the other hand, they denied that anyone had given them any such warning or had criticized their work; they testified that at the time of their discharge Belov stated that they were good workmen and that he did not know why they were discharged. The Board reviewed the time studies and found they did not reveal with any degree of precision the relative efficiency of the men. It concluded that they were discharged because they joined Amalgamated. The evidence as to inefficiency is quite inconclusive. The Board was justified in relying on circumstantial evidence of discrimination and was not required to deny relief because there was no direct evidence that the employer knew these men had joined Amalgamated and was displeased or wanted to make an example of them.

The court below also refused to enforce the Board's order reinstating and making whole Kalamarie who was discharged according to the Board because of his union activities. He, like Karbol and Cumorich, did not accede to the solicitation of Belov on behalf of Independent. He had joined Amalgamated in March, 1937, was an active solicitor for it, and served on its grievance committee. As a member of that committee, he called on plant manager Berry to protest the lay-off of a union man. Shortly thereafter, Belov, Kalamarie's night boss, received instructions from the day foreman to lay Kalamarie off for a week if his work did not improve. November 30, 1937, he was permanently laid off for an alleged lack of work as a welder and in connection with a general reduction of employees. Until his promotion as a welder a few months earlier Kalamarie for some time had been an acetylene burner. He testified that when

he took the job as welder, he was promised that he could go back to burning without loss of his seniority rights if welding ran out. This was denied by the foreman. When he was laid off, men junior to him as burners were retained. He protested. The company insists that the refusal to restore Kalamarie to his old position as burner was consistent with its occupational seniority policy. On this there is some contradiction in the record. There is testimony that under company practice an employee retained (or at least might be given) his original seniority if he was promoted to another position in the same department. The reasons stated for not restoring Kalamarie to his old seniority position were that he did not ask to be put back and that the company would have had to lay off a burner senior to him. These statements were contrary to the facts as found by the Board. On this state of the record we think that the Board was justified in concluding that Kalamarie was in fact discharged because of his activities for Amalgamated.

The judgment is reversed and the cause is remanded to the Circuit Court of Appeals with directions to enforce the Board's order in full.

*Reversed.*

Mr. Justice McReynolds took no part in the consideration or disposition of this case.