**NATIONAL LABOR RELATIONS BOARD v. ALUMINUM GOODS MFG. CO.**

No. 7742.

Circuit Court of Appeals, Seventh Circuit.

Feb. 2, 1942.

Robert B. Watts, of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Malcolm F. Halliday, Laurence A. Knapp, Associate General Counsel, Ernest A. Gross, Asst. General Counsel, Owsley Vose, and William J. Isaacson, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

A. L. Nash, W. J. Clark, A. F. Rankin, and John P. Nash, all of Manitowoc, Wis., for respondent.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

The important question presented here is whether an order entered by the National Labor Relations Board, now sought to be enforced, is supported by substantial evidence. The Board found that respondent had interfered with, restrained and coerced its employees in the exercise of their right to self organization as defined in Section 7 of the Act, Title 29 U.S.C.A. § 157, interfered with the formation and administration of the G. M. Workers' Association, an unaffiliated employees' organization, and contributed support to it in violation of Section (8) (2) of the Act, 29 U.S.C.A. § 158(2), and discriminated against various members of the "Union," affiliated with the American Federation of Labor, in regard to their hire and tenure in violation of Section (8) (3) of the Act. The order, entered on July 27, 1940, directed respondent to cease and desist from the unfair practices and ordered it to refuse to recognize the "Association" as the collective bargaining agent of its employees, to reinstate, with back pay, the employees discriminated against and to post appropriate notices.

The testimony to which the Board gave credence bearing upon respondent's alleged interference with the Unions follows. In the summer of 1936 a plant manager said to an employee who had protested being laid off that "you union fellows are getting too smart. * * * You stuck your necks out until you got them cut off." He advised another employee seeking promotion that only "loyal" workers would be considered and that the employee should remind his father of what had previously happened to him and tell him "that he should drop the union." In the spring of 1937 the foreman of the riveting room warned employees that they would incur the displeasure of respondent by persisting in becoming or remaining union members. A meeting of certain employees resulted in a letter written by the leader of the group to a foreman requesting him to withdraw certain antiunion statements and to advise employees that they would

not be punished for union activity. Following this letter the writer was summoned to the executive office where three of the force were present and told that they were aware of what had happened, saying that "you may think we don't know these things but we do." They asked him what he meant by sending the letter to the foreman and accused him of soliciting union memberships on company time (which he denied), warning him that respondent was warranted "in firing him" for such action. He was told also that he evidently did not appreciate that respondent "had given him a job when he first came to the plant a long time ago." Obviously, the legal duty of respondent, upon learning of the complaint against the foreman for making antiunion statements, was to have taken steps to remove any effect of his action. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309.

One of the superintendents asked an employee wearing a union button whether he or the union "had given her a job" and questioned her regarding her father's connection with the union. The foreman of the shipping department said to an employee wearing a union button, "so you are wearing one of those things * * * after I have given you a job, you take this and throw it back in my face." Another foreman asked an employee wearing a union button how the management would feel "if it should find out that he was not satisfied"; the employee thereupon removed his button. Thereafter the same foreman attempted to persuade the employee to renounce his membership. A foreman of the shipping department at Plant No. 1 said to an employee that "anyone who joined the union is a damn fool." An assistant foreman at Plant No. 2 told an employee that he and his fellow workers would never get any place if they belonged to the union. A foreman in the metal department at Plant No. 2 advised an employee "not to join the union; * * * wait about five years." Somewhat similar statements were made by two other foremen. Superintendent Becker, upon being asked when employees might return to work, said "if they had not listened to the union organizers the fall before, they would have a lot of work now."

■ Giving credibility to this and other similar testimony the Board concluded that the respondent had interfered with, restrained or coerced employees in the exercise of their right to self organization as provided in Section 7 of the act. The incidents relied upon covered a period of some three years and occurred in plants where there were some 3000 employees. Respondent in letters and notices advised employees of their protection under the act and of their right to select their own bargaining agent free of influence by respondent or any other person and assured them that whatever union they might select or whether they belonged to a union would be immaterial so far as fair treatment by respondent was concerned. But the Board believed that the series of events related by employees above referred to, including others of similar purport, was sufficient to overcome the expressed impartiality of respondent in its attitude toward the formation of unions affiliated with the A.F. of L. With this resolution of conflicting testimony we are not concerned. Our only inquiry can be as to whether the finding is supported by substantial evidence.

■ The recitals herein before included are of such character, in the way of threatening antiunion statements and questioning by respondent with regard to union activities and union officials as to prevent us from saying as a matter of law that the finding and the order in pursuance thereof were not justified. There was sufficient testimony which the Board believed and upon which it acted to support a reasonable inference that respondent did not observe that strict neutrality and impartiality imposed upon it by the Act when free selection by its employees of their bargaining agents was involved. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. Burry Biscuit Corp., 7 Cir., 123 F.2d 540.

■ The Board found also that respondent had interfered with and supported an independent union, that is, the Association. This organization came into existence after a strike called by the affiliated unions had been terminated by a contract between respondent and the affiliated unions. Some of the employees preferred an independent union. They took steps to investigate such organizations, consulting an attorney and instructing him to draft constitution and by-laws. Election of officers followed and a drive for members began. During this drive one foreman advised an employee that the Association offered more cheaply everything the affiliated

unions would secure. Another urged an employee that it would be better if she joined the Association because that "would be the best union." In December the latter foreman informed another employee that he was to be laid off and suggested that he had "better sign" an independent union card and thus "get a better chance" of getting back to work. A foreman at Plant No. 1 advised the wife of one of his employees that she should encourage her husband to join the independent, as, thus, "he would be sure to hold his job." Still another foreman suggested to an employee that the reason why he had failed to receive certain employment was because he was wearing a union button and told him "to join up with the rest of the gang * * * the independent."

The night die setters were active in this campaign. The Board found that their activity was of a supervisory character because at night they gave orders to other employees, reported employees' misconduct and, in the absence of representative foreman, took charge of the department. The testimony indicated that these die setters were ordinarily regarded as assistant foremen who helped the department and "took charge" when the foremen were gone. It accordingly concluded that they were supervisory employees for whose action respondent was accountable. Whether this was a correct solution it is not necessary to decide, even if it were within our province, but it would seem that a question of fact only was involved in such conclusion and that the finding of the Board upon it is conclusive. At any rate these employees openly solicited others under their supervision to join the Association, and warned them that they would be "fired if they did not join." Some of the foremen and supervisory employees held prominent positions in that organization.

These and other incidents the Board believed proved that respondent had attempted to promote the organization and success of the Association. Irrespective of the exact position of the die setters, the acts and statements of the executive officers, superintendents and foremen, under International Ass'n of Machinists, etc., Lodge No. 35 v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, constituted substantial evidence in support of the finding.

■ Respondent asserts that it should not be charged with having assisted in the formation of the Association for the reason that it formally declined to grant the Association's request for recognition in the spring of 1938, but the weight of this fact as evidence is weakened by the further fact that the refusal was made only after the charge had been filed with the Board that respondent had interfered.

We conclude, therefore, that the factual situation is such that we can not say as a matter of law that the finding was without substantial supporting evidence.

■ The Board made a further finding that, by supporting the "back to work movement" during the time the strike was pending, respondent had been guilty of violation of the Act. A careful examination of the record convinces us that no evidence supports this finding. The unions called the strike, formed a picket line and prevented anybody from entering the plants. Almost 3000 employees were affected. At many plants the strikers were in the minority; the majority desired to work. After weeks of idleness a project evolved, called the "back to work" movement. But this originated with the employees. There is no evidence that any of the executive officials or responsible supervisory representatives of respondent instigated, aided or abetted it. They only tacitly permitted their employees to carry on the program. There is no charge that any meetings were held upon company premises or that respondent said anything to provoke the employees to take such action. Some of the foremen joined in the undertaking but the record is devoid of testimony indicating that they did so otherwise than as voluntary independent agents desirous of regaining employment. Furthermore the "back to work" movement never became effective, because, while it was pending, the strike was ended by contract between respondent and the unions. This portion of the Board's finding is not supported by substantial evidence.

■ The Board found further that respondent had been guilty of discrimination in lay-off and re-employment of some ten employees. At the outset, it is well to remember that, because of a business depression, some 511 employees were laid off. At that time, according to the Board's figures, 56 per cent of the employees belonged to the Unions, according to respondent's figures, 62 per cent. Of the men laid off, only 49 per cent were union men.

Obviously, therefore, at the beginning of the original lay-off, if there was any discrimination between nonunion and union men in relieving them of employment, that discrimination was in favor of union members. But the Board considered it proper to consider the few cases from an individual standpoint irrespective of the general impartial treatment thus evinced.

Krueger and Marquardt were laid off with the others. The Board found that they were discriminated against because, when they were relieved, one man was retained who was lacking in seniority. Obviously both could not be discriminated against by retention of one. If it was necessary to lay off two and one was retained wrongfully only one of the two laid off could replace him. Aside from this, Krueger was seriously disabled because of a previous injury. He had been unable to procure other regular work because of that fact, but had been retained by respondent in suitable employment.

Under the contract between the union and the respondent, in laying off men, respondent had a right to consider not only seniority but also skill and ability and the family situation of the employee. The foreman of the department in which these two men worked testified that Krueger was incapable of operating the automatic spinner. The man retained could operate it. There is no evidence to indicate that either man was discriminated against because of any union activity. In reaching this conclusion, we pay no heed to respondent's suggestion that one of these men was a convicted felon.

Vnuk and Tadych were laid off as a part of the 511 men in their proper order of seniority. But it is said that five other employees were reinstated in violation of seniority rights about a month after they were laid off. Some of them were members of the union or had been, having worn union buttons, and there is no evidence that any of them were rehired in lieu of the other two because of any union connection. The foreman found that he needed five blankers and out of the nine highest on the seniority list there were five who could do the work and four who could not. Those who could not, were not called back. Obviously respondent, taking into consideration, as it might rightfully, the skill and ability as well as strict seniority of the various employees might, without any basis for charge of unfair action upon its part, determine which of the men it thought best suited to do the work.

Brull, Martell and Wilson were discharged in the proper order of seniority. But the complaint is that the reinstatement of one Walesh in March 1938 constituted discrimination against them. At the time Walesh was reemployed the record shows that men were paid 52½ cents and boys 44 cents and that Walesh was recalled at 44 cents, and though the parties are in controversy as to whether one witness in describing Walesh said "boy" or "man," an analysis of the Board's transcript is clear to the effect that Walesh was in the class drawing 44 cents, that is, that he was classed as a boy. Therefore, the rule of seniority did not apply. The Board itself said that it was not persuaded that it was intended by the parties to require uniform application of rules of seniority as between men and boys. The error of the Board lay in its failure to observe the proper rating of Walesh.

Gustafson was laid off in proper seniority order, but, five days later, three men were transferred to his department where they worked for two months. The record is silent as to what happened as to them after that period. Again there is no evidence to support a finding that the transfer of these three men from one department to another was discrimination against Gustafson in view of the fact that he had been laid off in proper seniority.

Harrop was a member of the department in which every employee belonged to the union. The charge of discrimination involved Kvitek, Bohlman, Malfroid and Gauthier. The two latter obviously were retained because of their greater skill and ability. Kvitek had been working on aluminum roasters and when he was transferred to the place where Harrop had been working, he continued the same work. Again the record is devoid of evidence to support a finding of discrimination.

Hansen was laid off with the others, but it is said that the retention of Stehle and Oestreich and the temporary reinstatement of Short effectuated discrimination against him. Short was rehired for only a short time when he was again laid off. Stehle and Oestreich were doing clerical work which required training. Hansen was not fitted to do this. He asserted he could have done it without training and that his lack of skill and ability should have been

disregarded but there is nothing in his own opinion which would take from the respondent the right under the seniority clause to consider his skill and ability as compared with that of those retained.

The difficulty as to these matters of discrimination lies in the fact that the employees, subject to the exercise of respondent's judgment as to their respective talent, skill and ability, feel they have been discriminated against when as a matter of fact the record discloses only the exercise of judgment in determination of what employee should best be retained or recalled. It may be that in laying off over 500 men, exact justice was not attained and that the circumstances of some employees were such that it would appear that unintentional injustice has occurred in unrelated instances. But if such results have occurred they are far from amounting to substantial evidence of intentional discrimination against men because of union activities, especially in view of the fact that the proportion of union men laid off was less than that of nonunion men. Rather the evidence, at its strongest for the employees, discloses only the ordinary marginal errors of impartial human judgment, wholly free of intentional discrimination.

■ The Board found also discrimination by respondent in selecting men for special holiday employment. Each year, during the holiday season, respondent suspends operation for a brief period for the purpose of cleaning and oiling its electrical machinery and equipment. The electricians at the several plants select various production employees for this task and supervise their work. A small number of men work temporarily for a few days under such selection at each of the plants. The complaint is that some union men were not hired. On the other hand some union men were hired, and there is in the record nothing to indicate that in asking the men to do this temporary work, any discrimination was employed. There is no evidence of refusal to allow any applicant to participate in this extra work. This portion of the order involves a comparatively small amount of money and slight extra irregular work during holiday season for a few men out of several hundred. The whole subject was unworthy of attention.

■ Petitioner has moved to strike the transcript of respondent and, apparently, in view of the language of the statute, inasmuch as this transcript was not prepared from the official record but from that of an independent court reporter employed by respondent, the motion is well grounded. Such transcript as this court may consider must be prepared entirely upon the official record. N.L.R.B. v. Westinghouse Air Brake Co., 3 Cir., 120 F.2d 1004; N.L.R.B. v. Foote Bros., etc., Co., 311 U.S. 620, 61 S.Ct. 318, 85 L.Ed. 394. Accordingly we have considered only the transcript of the Board. Where it has been contended by respondent that this transcript is in error we have had recourse to the official record on file with this court and followed it.

■ Respondent's motion for leave to take additional testimony will be denied. The proffered evidence is not relevant as to the findings and conclusions which we have approved and as to the findings which we have disapproved, it is immaterial, in view of our conclusions.

Accordingly our conclusion is that there was substantial evidence to support the Board's finding of unfair labor practices in that respondent interfered with and attempted to prevent the recognition of the Unions, that it influenced promotion and attempted to secure the success of the Association and that the Board was justified in ordering respondent to cease and desist from these practices. On the contrary the finding as to alleged discrimination in laying off and rehiring is not supported by substantial evidence. Nor is respondent to be charged with any violation of the law because of what occurred in the "back to work" movement. The record is wholly devoid also of evidence to support the finding of discrimination of the Board as to holiday employees. The order to desist from unfair practices shall be limited to the provision that respondent "will not engage in the conduct from which it is ordered to desist." National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, at page 439, 61 S.Ct. 693, 85 L.Ed. 930. The order of the Board will be modified in accord with this opinion and thus modified, enforced.