## NATIONAL LABOR RELATIONS BOARD v. M. A. HANNA CO. et al.

### No. 8964.

Circuit Court of Appeals, Sixth Circuit.

Feb. 13, 1942.

Joseph Hoskins, of Washington, D. C. (Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, Samuel Edes, and Wm. J. Avrutis, all of Washington, D. C., on the brief), for petitioner.

Thomas F. Veach and Luther Day, all of Cleveland, Ohio (Thomas F. Veach, of Cleveland, Ohio, Donald D. Harries and William K. Montague, both of Duluth, Minn., Jones, Day, Cockley & Reavis, of Cleveland, Ohio, and Gillette, Nye, Harries & Montague, of Duluth, Minn., on the brief), for respondents.

Before SIMONS, ALLEN, and McALLISTER, Circuit Judges.

## McALLISTER, Circuit Judge.

On a petition for enforcement of an order of the National Labor Relations Board, the principal question to be determined is whether there was evidence to sustain the findings of the Board that the respondents have been guilty of illegal interference, discrimination, and support of a company union.

About 1932, the respondents formed the Employees' Organization, printed its by-laws, and were active in inducing their employees to participate therein. This organization was administered by committees of employee representatives, and joint committees composed of an equal number of employees and representatives of the management. The committee meetings were held during working hours and the employees were compensated for the time therein spent. No provisions were made for general meetings of the employees. Grievances were presented to joint committees and thence to the presidents of the companies, and arbitration could be had only if the president consented. This organization continued in existence for two years after the passage of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and when the Act was held valid by the Supreme Court, the respondents advised the employees that the organization could not be continued. There is no question that the organization, up to this point, did not comply with the provisions of the Act. Thereafter, various officials of the companies, including superintendents and foremen, became interested in advising the employees against joining an outside organization. About this time, the Steel Workers Organizing Committee of the CIO was attempting to organize the employees. A superintendent advised one of the employee representatives of the old organization that there was no use in joining an outside organization, and that the men should take over the company union and carry it on. One of the foremen told the same representative that it was foolish to pay dues to outsiders who would get the men into trouble, when they could have an organization that would cost them practically nothing. A superintendent convened a meeting of the employee representatives of the old organization, told them they could get lots more out of a local union than by affiliation with an organization like the CIO, which he referred to as a communistic organization, carried on by Communists. Thereafter, on May 1, 1937, Mr. Cannon, the assistant general manager of the M. A. Hanna Company, met with the superintendent of three of respondents' mines and with the chief engineer, and told them that the former organization could not be continued and that they should advise the representatives thereof that it was up to them as to what they did in the future. At the same time, the assistant general manager gave the superintendents a set of mimeographed bylaws, with advice to transmit them to the representatives of the old organization, with the information that they

represented the revision of the bylaws of the old organization and were available for use in forming a successor union if the representatives so wished. Pursuant to such instructions, the superintendents called together the representatives of the old organization and delivered to them copies of the revised bylaws, and the message of the assistant general manager concerning their use. Thereafter, the representatives of the old organization met to discuss the formation of an inside union and voted to put the question to the employees by referendum vote; but, subsequently, at another meeting of these representatives, it was voted to discard the plan of a referendum vote; and they decided to proceed with the formation of an inside union to be known as the Independent. Shortly thereafter, membership application cards in the proposed Independent union were circulated at respondents' mines by the representatives of the former organization, and respondents, although aware of this activity, made no effort to stop this campaign, which was carried on largely during working hours. Superintendent Mahon took an especially active interest, about the first part of June, and, at a safety meeting held at one of the mines, addressed the employees, telling them that they would be better off if they joined the Independent. He compared the risk involved in choosing representatives to the danger of a child in playing with dynamite, and said that if respondents' employees had been members of the outside union they would have been in danger of being "thrown into a strike which was caused by men and called for men in Chicago, and in which we might not have any interest whatsoever." Mahon stated at this meeting that he was only expressing his personal views in the matter. On other occasions, he exhorted the employees to "go up to the machine shop and sign up right now" with the Independent; and at other times he reproached an employee for joining the CIO, referring to such union as a racket composed of a bunch of Communists. He also suggested that a man who joined the CIO was ungrateful because of everything the respondents had done for him, and told another that since he joined an outside organization, he should go back to another company where he had worked previously.

It further appears that Mr. Cannon, the assistant general manager, in questioning an applicant for employment, interrogated him as to whether he approved of a local or outside union. When a committee of employees associated with the Steel Workers Organizing Committee called upon Cannon to complain of intimidation of the miners by management representatives, he said, in reply to their protests, that he could not see why they had any cause for complaint, stating: "Well, I can't see where you guys are kicking, you had three or four weeks start ahead of us."

There is evidence that foremen made statements at various times to employees, advising certain ones who had become members of the CIO union to withdraw from such organization, and that they would be better off if they quit the CIO; that such union was a "bunch of Reds," that it was imported from Russia; that in the event of an election conducted by the Board, "there won't be no more mines, and the company won't recognize no union"; and that the employees "would be better off without any union whatever." When certain employees were questioned by one of the foremen concerning the meetings of the Steel Workers Organizing Committee, and they refused to divulge any information, they were told that the foremen could find out more about what was going on in that union than they, themselves, could. In other statements, foremen told employees that it was foolish to pay dues to an outside union when a local union could be formed; and an intramural organization was emphatically and continually urged upon the employees by a number of the foremen.

Toward the latter part of May, 1938, when a committee from the Steel Workers Organizing Committee called upon the assistant general manager and advised him that they represented a majority of the mine employees, and requested sole collective bargaining rights for such employees, offering at the same time to withdraw their petition and charges filed with the Board if such rights were granted, Mr. Cannon replied that the matter would have to be referred to higher authorities. But no definite action was ever taken. Toward the latter part of June, George Miller, an employee, called a meeting of employees in the City Hall Auditorium in Iron River and the present organization, known as the Mine Workers Union, was thereupon formed. Practically all of the proposed bylaws submitted to the representatives of the former Employees' Organization were

adopted as the bylaws for the Mine Workers Union. No dues are required, but instead, there are provisions that the expenses of the organization are to be met by voluntary payments of employees.

It is contended by respondents that the foreman and superintendent Mahon, were not acting on behalf of respondents in discouraging the organization of an outside union or the formation of a local union, and that respondents are not responsible for their utterances or action. It appears that after the complaint of the Steel Workers Organizing Committee in July, 1937, Mahon was instructed by the assistant general manager to cease talking to employees on behalf of the local union and against the CIO, and it does not appear that he thereafter continued to do so. It is further claimed that the statement of the assistant general manager to the committee of the CIO, who complained about intimidation of employees, that they had no cause of complaint because the union had a considerable head start on the company in organizing the employees, was spoken in a jocular vein, and it is insisted that officials, individuals, and representatives of the company cannot be deprived of their right to free speech to express their opinion on union matters.

■■■ The Board found that the respondents conceived the plan of an inside union as a buffer to the organizational campaign of the CIO; that they encouraged the employee representatives to form an intramural organization to replace the former Employees' Organization; that they promoted the Independent and the Mine Workers Union; that their representatives assisted in these endeavors; and that the respondents had dominated, interfered with, restrained and coerced the employees in their right to form, join or assist labor organizations, to bargain collectively, and to engage in concerted activities for the purpose of collective bargaining. It is unnecessary to review in detail the rather extensive record and the numerous claims and arguments advanced by the respondents. Much of the argument is, in effect, directed to the question of the weight or preponderance of the evidence. We are limited, however, to the determination of whether there was any substantial evidence to support the findings of the Board; and are of the opinion that reasonable inferences could be drawn from the evidence to sustain its conclusions. The question of

the responsibility of respondents for the expression of opposition to the CIO, and efforts to promote the independent union, have been often discussed and passed upon. Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38. See International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 79, 81, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L. Ed. 368; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 518, 61 S.Ct. 320, 85 L.Ed. 309; Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U. S. 287, 295, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200. With regard to evidence that respondents sponsored the establishment of the Independent, see Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473, 483. There was evidence, from which the Board could draw inferences, that the efforts of respondents and conduct of respondents' supervisory employees in attempting to have members of the CIO abandon their organization, were in violation of the statute. See National Labor Relations Board v. Link-Belt Co., supra; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S. Ct. 918, 84 L.Ed. 1226.

■■ In the findings of the Board it is stated that one of the individuals taking an important part in the efforts of respondents to interfere, and support the organization of the Independent, was chief electrician Erickson. The evidence shows that an employee named Erickson was one of those active in organizing the Independent. The chief electrician, having the same name, did not participate in these efforts. We are of the opinion that these statements in the findings are not sufficient to vitiate the order of the Board. Without such findings, there was ample evidence to support its conclusions, and in our opinion there can be no reasonable doubt that such misconceptions could not materially affect the findings that respondents had violated the Act in the manner complained of. To sustain the order of the Board, requiring an employer to cease and desist from interfering with, restraining, or coercing employees in exercise of the right of self-organization and collective bargaining, it is not necessary to sustain all of the findings of the Board, but only those on which the order was based. National Labor Relations Board v. Yale & Towne Mfg. Co., 2 Cir., 114 F.2d 376.

Respondents cite the case of National Labor Relations Board v. Virginia Electric & Power Co., 62 S.Ct. 344, 86 L.Ed. ——, decided December 22, 1941, in support of their contention that the expression of opinion by officials of the respondent companies cannot be the basis of an order by the Board. However, the order was based upon all of the findings of the Board, which included activities found to be in violation of the Act; and according to the authority cited, conduct, although evidenced in part by speech, may amount, in connection with other circumstances, to coercion within the meaning of the Act; and whether the whole course of conduct, evidenced in part by the utterances, was aimed at achieving objectives forbidden by the Act, is a question for the Board to determine upon the evidence.

Other contentions made with regard to jurisdiction are without merit. Lyons v. Eagle-Picher Lead Co., 10 Cir., 90 F.2d 321. Upon request of the Board to modify Sec. 2 (b) of the order, to require respondents to post notices that they will not engage in the practices from which they are ordered to cease and desist, such modification is granted.

A decree will be entered, granting enforcement of the order of the Board as above modified.