## NATIONAL LABOR RELATIONS BOARD v. FORD et al.

### No. 10605.

United States Court of Appeals
Sixth Circuit.
Nov. 15, 1948.

Harold Cranefield, of Detroit, Mich., and Robert N. Denham, Gen. Counsel, N.L.R.B., of Washington, D. C. (David P. Finding, Ruth Weyand, and Thomas F. Maher, all of Washington, D. C., on the brief), for petitioner.

Arthur W. Wiles, of Columbus, Ohio (Wiles & Doucher, of Columbus, Ohio, on the brief), for respondent.

Before HICKS, Chief Judge, and ALLEN and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The National Labor Relations Board petitions for a decree of enforcement of its order of March 21, 1947 against the Respondents Wilbur H. Ford, Chester Ford and John Ford, partners doing business as Ford Brothers, following the usual proceedings under § 10 of the National Labor Relations Act. 29 U.S.C.A. § 160. Jurisdiction is conceded.

The Respondents are engaged in contract hauling of gasoline and other petroleum products in Ohio, West Virginia and Kentucky, with their principal place of business at Coal Grove, Ohio. Starting in 1932, their operations expanded gradually until by June 1945 they were operating 13 tractors and 17 trailer tanks and employing 23 full-time drivers and a staff of mechanics. The driver takes a tractor with accompanying trailer tank to a refinery or bulk station where an employee of the refinery loads the trailer with gasoline or other petroleum product, measures it, seals all outlets, and gives the driver a receipt showing the name of the consignee. On arrival at the destination the seals are normally broken by the consignee and the gasoline pumped off by him. Complete drainage of the trailers is a matter of some difficulty. The bottoms of the compartments are uneven, gasoline adheres to the transport walls, and residues are left because the unloading is done on unlevel surfaces. Although all reasonable efforts are made to secure a full delivery, the trailer tanks on return to Respondents' lot usually contain around three or four gallons of gasoline, sometimes more. The drivers customarily and openly drained this residue after completing their assignments, and used it in their individual cars, without objection on the part of the Respondents. At times some of it was used by some of the Respondents.

During 1942, 1944, and 1945, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of

America engaged in organization activities in Respondents' business. On May 28, 1945, the union representative wrote to the Respondents claiming majority representation and asking for a conference for the purpose of negotiating a contract. Efforts to arrange a meeting were disrupted by the discharge of a driver named Edward Pancake on June 4, 1945, the details of which are hereinafter stated, and a subsequent work stoppage participated in by 15 other employees who had signed union authorizations.

Pancake was first employed by the Respondents in February 1937 as a driver at $15.00 per week. In 1940 Pancake took part in activities of the drivers to secure an advance in wages and was interrogated by Wilbur Ford for the purpose of finding out what the drivers wanted and what could be done. Pancake and other employees employed a lawyer to draw up a petition requesting an increase in wages which was signed and placed in the office. Wilbur Ford told Pancake and another driver that they did not need any contract like that. However, the desired raise in wages did not result. Over a period of time Pancake's initial salary was increased by successive raises until it was $30 per week by the middle of 1942. In July 1942, the Respondents terminated Pancake's employment because he made application for a job with a refining company without advising Respondents of his purpose to change employment. After about nine months in other employment, Pancake applied for work with the Respondents and was rehired at a base pay of $30 per week. After a few weeks his base pay was increased to $33.50 a week, which was the pay being received by other experienced drivers. His work was satisfactory during the periods of his employment, and the record shows no criticism of his driving by any of the Respondents.

During the last of May 1945 Pancake and three other employees were questioned by Wilbur Ford about their desire to have a union. In this conversation Pancake expressed the opinion that the employees wanted a union for the protection which it would afford, and gave as the underlying cause for the unrest among the drivers their desire for more money. Ford expressed disapproval of a union.

Pancake came in from a trip on the morning of June 4, 1945. Wilbur Ford observed him drawing gasoline from the trailers and putting it in the tank of his automobile. He summoned Pancake to the office and told him that he had violated a company rule forbidding such draining of gasoline. Pancake asked "what rule?" Ford merely replied that Pancake knew it was against the rule, and following a brief exchange of words told him he was discharged. Following the discharge of Pancake, 15 drivers, members of the Union, refused to drive their trucks in an effort to secure his reinstatement. At a meeting on June 6th, the Union proposed that all the drivers except Pancake be reinstated and that the issue of Pancake's right to reinstatement be submitted to arbitration. The Respondents offered to rehire, as new employees, all the drivers except Pancake, but would not agree to arbitrate or even discuss Pancake's case. The Respondents thereafter hired replacements for the union members out on strike.

The Board found that Pancake was known by the Respondents to be an active union protagonist and leader in concerted activities among the employees; that the alleged reason for his discharge was not substantiated; that his discharge was discriminatory, motivated by his union membership and activity, and designed to discourage membership in the Union, and that thereby the Respondents had interfered with and coerced their employees in the exercise of the rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157; that the strike beginning June 4, 1945, resulted directly from the discriminatory discharge of Pancake, and that its continuation was also due to Respondents' unfair labor practice in refusing to rehire Pancake; and that the Respondents, by anti-union activities, had interfered and coerced their employees within the meaning of § 8(1) of the Act, 29 U.S.C.A. § 158(1). The cease and desist order of March 21, 1947 followed, including provisions for the reinstatement of Pancake and the striking employees without loss of pay, and the posting of appropriate notices.

We are of the opinion that the findings of fact of the Board are supported by substantial evidence on the record considered as a whole and accordingly are conclusive. 29 U.S.C.A. § 160(e). There is considerable evidence in addition to that relating to Pancake, as set out above, which shows an attempt on the part of the Respondents to discourage their employees from joining the Union. Virgil Criss, a driver, testified to the attempts of Chester Ford to deal with him confidentially and the offer of an individual wage increase, for the purpose of breaking down his union allegiance. John C. Shelton testified about Chester Ford's threats of discrimination against union members. Raymond Coyer, a driver, testified that Wilbur Ford questioned him about union membership and union leadership. Kenneth Hinson, a driver, testified about Wilbur Ford attempting to deal with him individually and confidentially with the suggestion of a wage increase. William Ratliff told of a conversation with John Ford in which he was advised to reject a union card if offered. Raymond Coyer also told of a statement made by Chester Ford that "if it went Union he would follow Dutch (Virgil) Criss until he got a chance to fire him and the Union wouldn't uphold him." Such evidence, even though denied by Respondents, is sufficient to sustain the finding that the Respondents have interfered with and coerced their employees within the meaning of § 8(1) of the Act. Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 685, 686, 64 S.Ct. 830, 88 L.Ed. 1007; H. J. Heinz Company v. N.L.R.B., 311 U.S. 514, 518, 61 S.Ct. 320, 85 L.Ed. 309; N.L. R.B. v. M. A. Hanna Co., 6 Cir., 125 F.2d 786, 788.

■ Respondents' contention that the statements referred to are within the constitutional guarantee of free speech is answered by the opinion of this Court in N.L.R.B. v. Peterson, 6 Cir., 157 F.2d 514, 515, where it was pointed out that such statements are justified only if the expressions in controversy are noncoercive, and that "If they are couched in such phrases, or attended by such circumstances that they tend to exercise undue influence and coercion upon the employees, the expressions of opinion are not protected." We agree with the Board's ruling that the statements referred to fall outside of the protected class.

■ The Respondents contend that the evidence fails to show that any employee was in fact intimidated or coerced by the statements or threats of the Respondents, and for that reason it is a case of "damnum absque injuria," making it a moot question unsuitable to be dealt with by any order of the Board. Such direct evidence, however, is unnecessary. As stated by the Board it is impossible to estimate the effect of such anti-union activities on employees generally and the reasonable inference is that anti-union conduct of an employer does have an adverse effect on self-organization and collective bargaining. The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act. N.L.R.B. v. Illinois Tool Works, 7 Cir., 153 F.2d 811, 814; N.L.R.B. v. Link-Belt Company, 311 U.S. 584, 588, 598-599, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. Aintree Corp., 7 Cir., 132 F.2d 469, 472, certiorari denied 318 U.S. 774, 63 S.Ct. 831, 87 L.Ed. 1144. We agree with the Board's conclusion in the matter.

■ The Respondents strenuously urge upon us that the finding that the discharge of Pancake was discriminatory and motivated by his union activity is not supported by the evidence. They rely upon a company rule forbidding employees to drain gasoline from the trailers, the undenied fact that Pancake violated this rule, testimony of Wilbur Ford that he discharged Pancake for violating the rule and because of Pancake's testimony that he was fired solely because of taking gasoline. The evidence is not convincing that even conceding that such a rule had been at one time promulgated by the Respondents, it had been brought to the attention of Pancake individually or the drivers generally. In any event, the great preponderance of the evidence shows that such a rule, even if in existence, was not enforced, but was openly and continuously violated by the drivers with the knowledge and implied consent of the Respondents. Pancake, Coyer, Nance,

Criss, Colley and Hinson testified to this effect, and it was stipulated by the parties that eight additional employees, if called as witnesses, would testify similarly and also that no one of them had ever seen a written notice or been advised orally by any of the Ford brothers that he should discontinue the practice of draining and using gas. It appears well established by the evidence before the Board that Pancake's discharge, for the reason given, was not justified. Wilbur Ford's testimony that that was the sole reason for his discharge is not conclusive on the issue. The probative value of such testimony was for the Board. N.L.R.B. v. Donnelly Garment Co., 330 U.S. 219, 231, 67 S.Ct. 756, 91 L.Ed. 854. If it is substantially contradicted by the other evidence and the accompanying circumstances, the Board is not required to accept it. N.L.R.B. v. Tex-O-Kan F. Mills Co., 5 Cir., 122 F.2d 433, 439; Elastic Stop Nut Corp. v. N.L.R.B., 8 Cir., 142 F.2d 371, 379. Nor does the fact that Pancake, called as a witness for the Petitioner, testified that he knew of no reason for his discharge other than his taking the gasoline, preclude the Petitioner from showing that another reason existed. N.L.R.B. v. Servel, 7 Cir., 149 F.2d 542, 544; Baldassarre v. Pennsylvania R. Co., 6 Cir., 24 F.2d 201; Louisiana Ry. v. McGlory, 5 Cir., 20 F.2d 545, 546; Zumwalt v. Gardner, 8 Cir., 160 F.2d 298, 302. The Board, in view of all the evidence, was justified in rejecting Respondents' claim that the discharge was solely because of the gasoline incident. Whether Pancake's discharge was for his union activity is another question. Considering his long experience and satisfactory work as a driver, it is clear that it was not for inefficiency. Nor do Respondents so claim. In view of the Respondents' general anti-union attitude over the preceding few years, the imminence of compulsory collective bargaining with the Union with the probable resulting increase in its influence among the employees, and Pancake's activity in that respect, the inference drawn by the Board that Pancake's discharge was motivated by such union activities is not an unreasonable one. Such inferences are for the Board, not for the Court, to make, and, if supported by the evidence, are not to be set aside even if a contrary inference is possible, or would have been drawn by the Court. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 596-597, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305.

A decree of enforcement will be entered.