231 F.2d 298
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
DIE AND TOOL MAKERS LODGE NO. 113, International Association
of Machinists, A.F.L., and Peerless Tool and
Engineering Co., Respondents.
 No. 11566.
 United States Court of Appeals Seventh Circuit.
 March 6, 1956.
Rehearing Denied April 19, 1956.
 
 David P. Findling, Associate Gen. Counsel, Frederick U. Reel, Atty., Theophil C. Kammholz, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Myron S. Waks, Attorneys, N.L.R.B., Washington, D.C., for petitioner.
 George W. Christensen, Washington, D.C., Thomas J. Downs, William W. Curran, Chicago, Ill., for respondents.
 Before MAJOR, LINDLEY and SWAIM, Circuit Judges.
 SWAIM, Circuit Judge.
 
 
 1
 This case is here on the National Labor Relations Board's petition to enforce its order issued against both respondents.
 
 
 2
 Respondent Die and Toolmakers Lodge 113, International Association of Machinists, A.F.L., is the sole bargaining representative for the employees of respondent Peerless Tool and Engineering Company. Section 2 of Article I of the collective bargaining agreement in effect between the Company and the Union provides that all employees who were on the date of the execution of the contract members of the Union shall remain members of the Union as a condition of employment and that all new employees shall within thirty-one days become and then remain members of the Union as a condition of employment. A rule of the Union provides that any member who fails to pay his dues for a period of three months automatically loses his membership.
 
 
 3
 Early in 1953 the Union sent the following letter to all of its members:
 
 
 4
 'Dear Sir and Brother:
 
 
 5
 'There will be a voluntary donation to support our striking Brothers in the following amounts:
 
 
 6
 '$10.00 weekly for those Journeymen working in shops with $2.73 contracts.
 
 
 7
 '$5.00 weekly for all others.
 
 
 8
 'The first of such assessments is due May 22, 1953.
 
 
 9
 'You will receive a receipt for your donation and the amount will be recorded on the assessment pages of your dues book.
 
 
 10
 'This assessment will run as long as it is necessary to win our fight.
 
 
 11
 'Fraternally yours, 'Die & Tool Makers Lodge 'No. 113 I.A. of M. 'D. W. McDole 'Financial Secretary'
 
 
 12
 Even though the employees of Peerless Tool and Engineering Company were not on strike, they were required to contribute their weekly 'donations' to the Union's strike fund.
 
 
 13
 In February of 1954 the Company notified the Union that it was going to have to lay off several employees and, pursuant to the collective bargaining agreement, listed those who were lowest in seniority as the men to be discharged. Thereupon the Union furnished the Company with a list of seven employees who were more than three months delinquent in their dues and requested that the Company discharge these named employees rather than lay off Union members in good standing who had less seniority. The Company then discharged five of the seven men named by the Union.
 
 
 14
 Two of the men discharged filed a charge with the Board claiming that the Union refused to accept their dues because they would not pay the 'donation,' and that the Company knew this when it fired them. The General Counsel of the Board filed a consolidated complaint accusing both the Union and the Company of unfair labor practices.
 
 
 15
 In its decision and order the Board concluded that the Union had violated Sections 8(b)(2) and 8(b)(1)(A) of the Labor Management Relations Act, 29 U.S.C.A. § 158(b)(2) and 158(b)(1)(A), by causing the Company to discharge the five named employees for reasons other than failure to tender union dues; and that the Union had further violated Section 8(b)(1)(A) by threatening that it would not process grievances for employees who refused to pay the 'donation.' The Board found that the Company had violated Sections 8(a)(3) and (1), 29 U.S.C.A. § 158(a)(3) and (1), by discriminating in regard to tenure of employment of five named employees. In this enforcement proceeding each respondent has vigorously contested the portion of the decision and order that is directed against it.
 
 
 16
 The Union.
 
 
 17
 The Section 8(b)(2) Violation.
 
 
 18
 The Union admits that it violated Section 8(b)(2) if it refused a valid tender of dues thereby causing an employee's discharge for reasons other than nonpayment of dues. The Board argues that this is exactly what the Union did, so the principal question on review is the existence of substantial evidence to support the Board's findings.
 
 
 19
 In its decision and order the Board stated:
 
 
 20
 'The Trial Examiner found that each of the discharged employees made a tender of dues on at least one occasion, and tender was either refused by the Union, or the money was misapplied to the assessment, and subsequent tender was excused as futile because the Union had a policy that payment of the assessment was a condition precedent to the acceptance of dues payments.'
 
 
 21
 The Union denies that the evidence shows a Union policy of conditioning the acceptance of dues upon payment of the 'donation,' and argues that the discharged employees had a duty to tender their dues each time they became due even if those for the previous month had been refused.
 
 
 22
 The first man to testify was Hall, one of the charging parties. He stated on direct examination that, with Taylor and Cantrell, he had gone to the Union office to pay his dues and had been refused. All three men had the amount of money they owed in their hands, but the Union officials refused to take it. Mr. Wilke, business representative of the Union, told them that the Union would not accept their dues until they paid the 'assessment.' Although Hall, Taylor and Cantrell were all excluded from the hearing room except when they themselves were testifying, they all gave substantially the same account of this occurrence. Wilke denied telling them that they would have to pay the 'assessment' before their dues would be accepted, but the hearing examiner credited the three employees and the Board accepted his finding. There is substantial evidence in the record to support this finding.
 
 
 23
 The Union did not actually refuse to accept dues from the other three men named in the complaint as it had from Hall, Taylor and Cantrell. However, these three men (Salisbury, Pieha and Bellendir) met with resistance in the form of misapplication and delay, and were told that dues would not be accepted unless the assessment was paid.
 
 
 24
 Edward Salisbury testified that he sent ten dollars and his dues book to the Union office, and that his book was returned to him without credit for paying his dues. When Salisbury asked a Union steward about this, he was told that he would have to pay the assessment. When the steward told Salisbury that he was behind in his dues, Salisbury offered to pay his dues but said he would not pay the assessment. The steward told him that he could not pay his dues until he 'straightened out the assessment along with it.'
 
 
 25
 Joseph Pieha told the examiner that the people in charge of the Union office would not accept his dues without the 'donation' until he told them that he had been sick for several weeks and was unable to pay it at that time. But he was told that the next time he paid his dues he would have to pay the assessment. Pieha also testified that he knew of other employees in his department, not involved in this proceeding, who were not able to pay their dues until they had paid the assessment. He did not attempt to pay his dues again.
 
 
 26
 James Bellendir is in much the same position as Pieha. Bellendir, too, testified that he was not allowed to pay his dues without the assessment until he told the Union officials that his wife had just returned from the hospital. The next time he tried to pay his dues the money was applied to the strike fund and he received no credit in his dues book. Bellendir made no further attempt to pay his dues.
 
 
 27
 The trial examiner and the Board concluded from the evidence that it was the Union's policy not to accept dues until the required 'donation' had been paid. They held that in the face of this policy plus the resistance to and, in some instances, outright rejection of tender, these men were not required to continue their attempts to force the Union to accept their dues.
 
 
 28
 There is sufficient evidence in the record to support the Board's finding that it would have been useless for these employees to continue attempting to pay their Union dues without first paying the 'donation.' They could reasonably have concluded that further tenders would also have been refused.
 
 
 29
 The law is clearly against the Union's contention that these employees were obligated to continue tendering each month's dues as they became payable even though their last tender had been refused. N.L.R.B. v. International Ass'n of Machinists, Local No. 504, 9 Cir., 203 F.2d 173, is a case much like the one before us. In that case an employee fell into disfavor with the respondent union because he organized and promoted a rival union. The respondent union fined him $500 and terminated his membership until the fine was paid. The employee refused to pay the fine. Shortly after this, the respondent union entered into a union shop agreement with the employer and asked that the employee be discharged because he had failed to pay his dues. In enforcing an unfair labor practice decree against the union, the Ninth Circuit held that the employee did not have to continue offering to pay his dues because he had been told by the steward that they would not be accepted. The court also gave weight to the fact that the employee had heard the steward say to another employee in the same circumstances, "You know I can't take dues from you guys." 203 F.2d at page 175.
 
 
 30
 The present case is even stronger because two of the discharged employees actually went to the Union office with their dues money in their hands and were turned away, and because the Union's policy was demonstrated by many more incidents. The law does not require the performance of useless acts. The petitioner also cites several insurance cases in which it has been held that tender of premiums need not be made where it is reasonably certain that they will be refused. Taylor v. Mutual Ben. Health & Accident Ass'n, 8 Cir., 133 F.2d 279; Shaner v. West Coast Life Ins. Co., 10 Cir., 73 F.2d 681. The Board was justified in finding that it was reasonably certain that any tender of dues from the five employees discussed above would have been refused.
 
 
 31
 The Section 8(b)(1)(A) Violation.
 
 
 32
 The Board approved the hearing examiner's findings in concluding that the Union had tried to coerce the employees named in the complaint in the exercise of their rights under Section 7 of the Act. The coercive statements cited by the Board were those made by Union Steward Chmeilak to the effect that the Union would not prosecute grievances for employees who did not pay the assessment. There is evidence in the record to support the finding that Chmeilak actually did make these statements.
 
 
 33
 At page 112 of the Joint Appendix George Cantrell testified as follows:
 
 
 34
 'Q. Would it be Tony Chmeilak? A. That is right.
 
 
 35
 'Q. What did he say at that meeting? A. He said the ones that didn't pay the assessment, if they brought a grievance to him that he would tear it up and throw it in the garbage can.'
 
 
 36
 At pages 139-140 of the Joint Appendix Andrew Barnes, an employee of Peerless and a Union member, testified:
 
 
 37
 'A. The main thing I noticed he (Chmeilak) said, he said that if we didn't pay this assessment, not to bring any grievance, because if we did he would tear the grievance up and throw it in our face.
 
 
 38
 'Q. Did Wilke (Union Business Representative) say anything at that meeting? A. Well, yes, he had quite a bit to say, but the main thing he said-- he sat around the table like this, and he walked around the table, and as he walked around the table, he said, 'Well, this here assessment is voluntary. You don't have to pay it if you don't want to, but if you don't pay it, don't come to the union for anything because you most certainly will not get it'.'
 
 
 39
 At page 177 of the Joint Appendix Charles Cerminn testified about Chmeilak:
 
 
 40
 'A. He said they wouldn't look into any of my grievances unless I could show my book showing that I had a paid-up membership.'
 
 And again at page 191 Cerminn said:
 
 41
 'A. There wasn't nothing said about not paying the assessment and taking up grievances. The only time the subject was discussed with Chmeilak was when we were told that he would not represent the men in the grievances if they didn't have their assessments paid.'
 
 
 42
 Chmeilak denied having made these statements, but the hearing examiner credited the employees and the Board accepted his finding. Of course, we cannot review these administrative determinations on the credibility of witnesses.
 
 
 43
 All of these statements except the last two, which were related by Charles Cerminn, occurred before October 15, 1953, and cannot, therefore, be cited as unfair labor practices because they were made more than six months before the charge in which they were alleged. 29 U.S.C.A. § 160(b). They do, however, lend credibility to Cerminn's testimony relating threats by Chmeilak which the examiner and the Board found were made within the statutory period.
 
 
 44
 Cerminn was never very clear about just when the meeting took place at which he heard Chmeilak say that he would not prosecute grievances for those who did not pay the assessment. On direct examination Cerminn said that it was in the fall of 1953, but that he talked to Chmeilak about the assessment almost every day. Although he specifically said that it could have been in September, October or November, he later stated that he attended the meeting 'much later' than writing a check to the Union which was dated September 14, 1953. At another point in his testimony Cerminn described the meeting as being in the 'late fall.' We feel that these statements, plus the fact that Cerminn and Chmeilak were constantly discussing this subject throughout the latter part of 1953 and the first part of 1954, furnished sufficient evidence to support the Board's finding that Chmeilak made at least one of these threats after October 15, 1953.
 
 
 45
 Such a threat is violative of Section 8(b)(1)(A) of the Act, 29 U.S.C.A. § 158(b)(1)(A), because, in the terms of the statute, it tends '* * * to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 * * *.' Section 7 gives employees the right to engage in concerted activities for their mutual aid or protection, and the right to refrain from such activities. The employees of Peerless, therefore, had the right to refrain from paying the 'donation.' Threatening to stop processing grievances for employees who did not pay the proper 'donation' was coercive within the meaning of Section 8(b)(1)(A). It was not simply internal administration of Union affairs because as the certified bargaining representative, the Union is required by the Act to represent and bargain for all of the employees in the plant. Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048, where the Court said that the unions' 'statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members, without hostility to any.'
 
 
 46
 The Company.
 
 
 47
 Sections 8(a)(3) and (1).
 
 
 48
 The Board also held that the Company had committed unfair labor practices in violation of Sections 8(a)(3) and (1) of the Act, 29 U.S.C.A. §§ 158(a)(3) and (1). Section 8(a)(3), of course, makes it an unfair labor practice for an employer to encourage or discourage membership in a union by discrimination in regard to hire or tenure. The only exception is the union's right to demand the discharge of an employee for failure to pay union dues when the company and the union have entered into a valid union security agreement. The section puts a proviso on this exception, however:
 
 
 49
 'Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization * * * (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.' 29 U.S.C.A. § 158(a)(3).
 
 
 50
 The Board found that the Company had knowledge of the Union's policy of refusing to accept dues until the assessment was paid, and knew that the six men named in the complaint had tendered their dues. It concluded that this knowledge constituted 'reasonable grounds for believing' that the Union membership of these six men had actually been terminated because they refused to pay the assessment and not because they failed to pay their dues. Discharging the men under such circumstances was a violation of Section 8(a)(3) because it discriminated against them in regard to their tenure of employment in order to encourage membership in the Union (continued membership in this case being conditioned upon payment of the assessment).
 
 
 51
 The Board also concluded that the employees' right to refrain from paying the assessment was protected by Section 7 and that the Company's action was, therefore, a violation of Section 8(a)(1). The only arguments made by the Company are that the Board's finding is not supported by substantial evidence, and that the trial examiner and the Board drew unreasonable inferences from the evidence.
 
 
 52
 The evidence was sufficient to support the finding that the Company knew that the five men it discharged had tendered their dues and that such tender had been refused. Hall testified that when he was notified of his discharge he told Mr. Fridlund, the Company's Personnel Director, that he had tried to pay his dues and been refused. According to Hall, Fridlund's only reply was, 'Well, I can't help that.' Taylor testified that he told Fridlund the same thing at the same time, and Cantrell testified that he heard both Hall and Taylor tell Fridlund about their tender and refusal.
 
 
 53
 Salisbury also testified that when Fridlund told him he was being discharged for failure to pay union dues, he told the personnel director that he had offered to pay his dues and was still willing to pay them at any time but that he would not pay the assessment. Pieha testified that at the time he was discharged-- 'Mr. Fridlund showed me a paper with a list of names on it, and my name was on there, and I told Mr. Fridlund that I would pay my union dues, but that they wanted the assessment, and I said I didn't think it was fair.' (Joint Appendix, page 156).
 
 
 54
 Cerminn testified that he told Mr. Fridlund that he was having trouble paying his dues because the Union was insisting that he pay the assessment first. Fridlund advised him to tender his dues by registered mail, and said that all the Company was interested in was that he pay his dues. Fridlund denied that he ever had any knowledge of whether or not the men discharged had tried to pay their dues, but the examiner and the Board credited the testimony of the employees on that question.
 
 
 55
 Section 8(a)(3) of the Act, defining unfair labor practices, provides that it shall be an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment * * * to encourage * * * membership in any labor organization * * *'; and, further, that 'no employer shall justify any discrimination against an employee for nonmembership in a labor organization * * * (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues * * * uniformly required as a condition of * * * retaining membership.'
 
 
 56
 The statements of the employees to the representative of the Company, as testified to by them, constituted a sufficient basis for the factual finding by the Board that the Company had 'reasonable grounds for believing that membership (in the Union) was * * * terminated for reasons other than the failure of the employee to tender the periodic dues * * * uniformly required as a condition of * * * retaining membership': that the employment of these men was terminated by reason of their failure to pay the strike assessments.
 
 
 57
 Union Starch & Refining Co. v. N.L.R.B., 7 Cir., 186 F.2d 1008, 27 A.L.R.2d 629, presents a situation analogous to the one before us. In that case the union and the company entered into a contract providing that all employees would have to join the union within thirty days as a condition of employment. Three employees tendered their dues and initiation fees but were refused membership because they would not take an oath of allegiance to the union. In thirty days the union requested their discharge as nonunion members and threatened the company with a work stoppage if its request was not met. The company fired the three employees. The Board found the company guilty of an unfair labor practice in violation of Section 8(a)(3) of the Act. This court enforced the Board's order against the company, holding that the company had discriminated against these employees in regard to hire, for other than failure to pay union dues, in order to encourage membership in the union.
 
 
 58
 It seems to us that the unfortunate position of the Company in this case is well described in a colloquy between the trial examiner and counsel for the Company during the hearing.
 
 
 59
 'Mr. Downs (counsel for the Company): Your Honor can certainly conclude, and I am sure that he would-- I don't mean in your capacity as an Examiner-- that if we did say to the union in answer to their letter of February that we would not accept that letter, and that it doesn't mean anything, that we would have a strike on our hands that afternoon.
 
 
 60
 'Trial Examiner: I can understand you, but unfortunately I have to be guided by the Taft-Hartley Act which says that a man can be fired only for non-payment of dues.
 
 
 61
 'Mr. Downs: Well, if you have the word of an employe that he did pay his dues or attempted to pay them, and you have the word of the union or its representative that the employe did not pay them, where does that put the employer?
 
 
 62
 'Trial Examiner: Right behind the eight ball, I would say.' (Pages 209-211, Joint Appendix.)
 
 
 63
 Following the recommendation of the Trial Examiner, the Board ordered the Union and the Company to cease and desist from the unfair labor practices, ordered the Company to notify the five men in writing that the Union had withdrawn its objections to their employment and requested their immediate and full reinstatement, and ordered the Union and the Company jointly and severally to make whole each of the five employees for any loss of pay suffered by reason of the discrimination. Neither the Union nor the Company makes any complaint in this court of that provision of the Board's order which requires that the discharged employees be made whole by the Union and the Company jointly and severally. Each, instead, is complaining only that the evidence was not sufficient to sustain the Board's finding of unfair labor practices as charged.
 
 
 64
 Since we have shown above that the evidence was sufficient, the order of the Board must be enforced. It is so ordered.