John A. HULL, Jr., Regional Director of the Eighth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, AFL–CIO, and its agents Robert Byron, Edward F. Carlough and Alfred J. Mosher; Local No. 70, Sheet Metal Workers' International Association, AFL–CIO, and its agents W. O. Frost, Lloyd Kenney and Robert J. Kidney; Local No. 65, Sheet Metal Workers' International Association, AFL–CIO, and its agents Clarence Desch, J. R. Dietz and Alton Page; Local No. 98, Sheet Metal Workers' International Association, AFL–CIO, and its agents Ross A. Boggs and Clifton D'Angulo; and Local No. 58, Sheet Metal Workers' International Association, AFL–CIO, and its agent Edward M. Hickey, Respondents.

Civ. A. No. 34266.

United States District Court
N. D. Ohio, E. D.
April 9, 1958.

James F. Foley, Washington, D. C., for petitioner.

Donald W. Fisher, Toledo, Ohio, for Sheet Metal Workers' Internat'l Ass'n.

Mortimer Riemer, Cleveland, Ohio, for Local Union Nos. 70, 98, 65 and 58, Sheet Metal Workers' Internat'l Ass'n, AFL–CIO.

WEICK, District Judge.

In this case, petitioner, who is the Regional Director of the National Labor Relations Board, seeks in behalf of the Board, a preliminary injunction pursuant to Sections 10(j) and 10(l) of the National Labor Relations Act, as amended (29 U.S.C.A. § 160(j, l) to restrain the respondents, Sheet Metal Workers' International Association and several of its local unions, from engaging in unfair labor practices, alleged to be in violation of Section 8(b), subsections (1) (A), (4) (A), (4) (B) and (4) (C) of the Act (29 U.S.C.A. § 158(b)).

An order to show cause was issued and in response thereto a hearing was held and the Court listened to the evidence offered by all of the parties for nine days.

During the progress of the hearing, the respondents, Local No. 58 and its agent Edward M. Hickey, were dismissed for lack of jurisdiction.

The charging party was The Burt Manufacturing Company, an Ohio Corporation of Akron, Ohio.

Burt filed its original charge with the Board on June 5, 1957 and its amended charge on December 13, 1957. The Board thereupon issued its complaint against respondents and notice of hearing thereon.

■ It is not necessary to decide whether the charge of unfair labor practices is true for this relates to the merits of the case and is a matter solely within the jurisdiction of the National Labor Relations Board to determine, subject to review by the Court of Appeals.

The petitioner is entitled to injunctive relief if he can show that there is reasonable cause to believe that the charge

is true. Hull v. Local No. 24, International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers, D.C. Ohio 1957, 148 F.Supp. 145.

The respondents and United Steelworkers of America and its local No. 1159 AFL-CIO are labor organizations within the meaning of Section 2(5) of the Act, 29 U.S.C.A. § 152(5).

On October 29, 1945 the National Labor Relations Board certified United Steelworkers of America, CIO, as exclusive bargaining agent of the employees of The Burt Manufacturing Company, an Ohio corporation of Akron, Ohio. Shortly thereafter a collective bargaining agreement was entered into between Burt and the Steelworkers' Union and a contractional relationship has continued ever since and is in force today.

Burt has been engaged since 1890 in the manufacture of roof ventilators and wall louver equipment. Its interstate business in 1957 amounted to $1,000,000. It is reasonable to conclude that the unfair labor practices alleged affects commerce within the meaning of Sections (6) and (7) of the Act, 29 U.S.C.A. §§ 156, 157.

Petitioner claimed that notwithstanding the Board's certification of the Steelworkers' Union as exclusive bargaining agent for Burt's employees and the collective bargaining agreement between Burt and the union, the respondents engaged in unfair labor practices proscribed by the Act to coerce Burt's employees to leave the Steelworkers' Union and join the respondent, International and its Local No. 70; that to accomplish said result respondent exerted economic pressure on Burt to persuade or to induce it to coerce its employees to join respondents' union; that the economic pressure was applied by respondents on Burt by boycotting its products by forcing their members not to handle or install Burt products; by forcing contractors, subcontractors and other employers who were customers of Burt and their employees not to handle or install Burt products; by distributing lists of fair contractors having collective bargaining agreements with respondents among their members and Burt's customers from which Burt's name had been omitted.

Petitioner further claimed that respondents induced or encouraged employees of employers to engage in a concerted refusal in the course of their employment to handle or install Burt products with an object of forcing an employer to cease handling Burt products, forcing an employer to recognize respondent, International and its Local No. 70 when it had not been certified as bargaining agent by the Board and forcing an employer to recognize or bargain with respondents when the Steelworkers' Union had been certified by the Board as exclusive bargaining agent for the employees.

The respondents claimed that their activities against Burt and Burt's customers were not for the purpose or with the object claimed by petitioner, but were in pursuance of its traditional policy of protecting its trade jurisdictional claims as established in its constitution and provided for in its standard form of collective bargaining agreement with employers; that the activities were not directed against employees nor were they for organizational purposes.

F. C. Sawyer, Vice President of Burt testified as to a meeting held in Akron on or about October 1, 1946 in the office of Burt's attorney with representatives of the International and Local No. 70 concerning a work stoppage at the General Electric job in Coshocton, Ohio because of the use of Burt ventilators; that one Frederick, representing the International stated that the Sheet Metal Workers would not install "scab" ventilators made by Burt. He inquired when Burt's contract with the Steelworkers' Union would expire and when informed as to the time stated that Burt should then take the men out of the Steelworkers' Union and put them in the Sheet Metal Workers' Union. Burt's attorney told Frederick that this could not be done. Frederick then stated that Burt should put the men in the Sheet Metal Workers' Union or

this coming fall when they go to their convention in Chicago a resolution would be passed placing Burt on the blacklist. Frederick suggested that Burt could shut down its plant and let the men go and in this manner they could be persuaded to join. Frederick stated that if they decided to release the job it would be the last time. The job was finally released and the men returned to work.

Sawyer further testified that during the period from 1946 to 1956 many construction jobs involving the use of Burt products were interfered with by Sheet Metal Workers' Union and that he continually complained about it to the officials of the Steelworkers' Union which had organized Burt's shop.

The evidence discloses that commencing in 1956 the activities of the respondents directed toward Burt increased in intensity. This increase in tempo coincided with a stepped-up nation-wide organizational drive directed by the International Union and was in accord with its national policy as disclosed in its official publications. Lists of so-called fair contractors, i. e., employers who had collective bargaining agreements with respondents were published therein and distributed to all the members of respondents in connection with the membership drive.

The letter dated December 16, 1955 written by Robert Byron, the General President of Sheet Metal Workers' International Association to B. W. Ohler, Director, District 28 United Steelworkers of America concerning a high school job at Medina, Ohio where Local No. 70 had refused to install Burt Ventilators, stated:

"This company [referring to Burt] has been non-union for our organization for many years, and we have tried a number of times to organize them but to no avail.

"We did not know that the steelworkers had an agreement with the Burt Manufacturing Company, so called on Business Representative Frost to release the job.

"We hope in the near future when your agreement with this company expires that with your help we may be able to put them into our organization where they belong as our fair contractors cannot compete with them. Their scale is at least one dollar per hour less then the sheet metal workers scale."

The letter throws some light on the purpose and intent of the Sheet Metal Workers with respect to organization of Burt's employees and explains the reason for respondents activities directed against Burt and its customers.

It is not understandable how the respondents can maintain that Burt has been "non-union" for them when the Steelworkers had been certified since 1945 by the National Labor Relations Board as exclusive bargaining agent for Burt's employees and were operating under a collective bargaining agreement with Burt.

The hope expressed that with the help of the Steelworkers' Union the men can be taken out of their own union and "put" in the Sheet Metal Workers' Union where they supposedly belong does not take into account the wishes of the workers who have the right under the law to join a union of their own choice.

Nor did the respondents establish that contractors who have collective bargaining agreements with them are "fair" contractors while those who have agreements with other labor unions are not.

Mr. Sawyer further testified that in meetings held in Washington in the summer and fall of 1956 representatives of the International again repeated their demands upon him that the Steelworkers be put in the Sheet Metal Union.

The constitution of the Sheet Metal Workers' International Association in Article (1) § 5 sets forth broad jurisdictional claims of the union not only to the manufacture and fabrication of sheet metal made of No. 10 U. S. standard or lighter gauge or its equivalent, but also to the assembly, installation, erection, repair and handling thereof.

Article (10) § 17 imposes upon a union member the duty to cooperate in maintaining its policy.

Article (17) provides penalties for the wilful failure or refusal of a union member to perform a duty or obligation imposed by the constitution, for violating an order of a union officer or for violating recognized and established union agreements. The penalties include fines and suspensions or expulsions from the union.

The collective bargaining agreements entered into by the Sheet Metal Workers' Unions with employers pursuant to its constitution are on a standard form.

Article (1) of the standard agreement sets forth the substance of the jurisdictional claims of the union as set out in its constitution.

Article (II) provides: "The employer agrees that none but journeymen sheet metal workers and registered apprentices shall be employed on the work described in Article (I)."

Article (III) provides: "The union agrees to furnish at all times to the Employer, duly qualified journeymen sheet metal workers and registered apprentices in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified within the agreement."

The respondents have construed Articles (I) and (II) of their collective bargaining agreements as prohibiting the employers and their employee members from handling or installing sheet metal products manufactured in union or non-union shops where the manufacturer does not have a collective bargaining agreement with them.

They have maintained a consistent position that an employer having a collective bargaining agreement with them who handles or installs the products of manufacturers not having such an agreement violates his agreement and justifies them in calling a strike or ordering their men off the job. They treat such other products as non-union even though made in union shops. It makes no difference to respondents whether the products are specified by the owner in a public or private contract. They will not permit their members to handle or install them. They insist on inspecting each construction job to determine whether the products which they have outlawed are being installed, and if they are, respondents take steps to prevent their installation.

They refuse to furnish their members to employers for installation work on construction projects as required by Article (III) of the standard agreement whenever the specifications or contract or subcontract provide for the use of products not made by their members, nor will they permit their members to work on any project where such products are used, except in a few cases where they have waived the requirements after trouble started.

William F. Rosenblatt, a partner in Wooster Sheet Metal and Roofing Company at Akron, Ohio testified as to a conversation with Business Representative Frost of Local No. 70 on November 30, 1956. Frost told Rosenblatt he was cancelling the collective bargaining agreement with Wooster because it had installed Burt ventilators on the General Tire job. Rosenblatt told Frost that Wooster had Burt ventilators for seven jobs and if the union would permit installation Wooster would agree not to buy any more in the future. On December 1, 1956 Wooster wrote the union confirming this arrangement.

Rosenblatt also related the dispute with the union over the Ohio Bell Telephone job in Akron in June 1957. Wooster gave Burt an order for ventilators in May 1957. They were ready for installation on June 11, 1957. He asked two of his workers, Wetstein and Pickett who were members of Local No. 70 to install them and they refused.

Wetstein testified that in the spring or summer of 1957 Kenney, a business agent of Local No. 70 visited the place where he was working. Wetstein asked Kenney what to do about ventilators not

made by AFL. Kenney said he wasn't sure and that if Wetstein wasn't sure not to bother with it. Wetstein said that his employer requested him in June 1957 to install a Burt ventilator and he said no.

Pickett testified that he told Rosenblatt that he was liable for a fine if he installed Burt ventilators.

Later, on June 21, 1957, Kenney gave his permission to install the ventilators.

On December 7, 1956 Rosenblatt called Kenney asking for permission to install Burt ventilators purchased by Firestone Tire & Rubber Company. Rosenblatt testified that Kenney told him "Let Santa Claus install them." Clearance was finally given on January 3 or 4, 1957.

Harry Whittington, Secretary and Treasurer of Kasch Roofing Company, Akron, Ohio, testified concerning disputes with Local No. 70 in 1956 and 1957. Kasch was a member of Sheet Metal Employers Association of Akron which included Wooster and others and bargained on behalf of its members with the International and Local No. 70. Frost accused Kasch of using non-union equipment, referring to Burt, Whittington told Frost that Kasch supplied equipment called for in plans and specifications provided for in a contract which obligated Kasch to perform. Frost told him it would be better if Kasch violated its contracts with others rather than violate the collective bargaining agreement. Frost furnished to Kasch a list of approved suppliers.

The week before Christmas 1956 Local No. 70 invoked against Kasch the grievance procedure provided in the collective bargaining agreement for alleged violation because of use of products of Burt and other suppliers who did not employ members of the respondents.

A hearing was held by the Joint Adjustment Board. Frost and Kenny stated at the hearing that Kasch violated Articles (I) and (II) of the agreement by installing non-union products of Burt and others. Frost stated that Kasch would have to live up to the agreement or

it would be cancelled; that the union would refuse to furnish men or allow Kasch's men to work.

Again on or about October 14, 1957 Local No. 70 brought Kasch before the Joint Adjustment Board claiming that Kasch violated Articles (I) and (II) of the collective bargaining agreement in connection with Highland High School in Medina. Frost told them that the agreement would be cancelled if Kasch did not comply with Article (I). Frost said union would not work in or tolerate an unfair shop.

On or about December 12, 1957 Business Agent Ringler of Local No. 70 arranged a meeting of three contractors Adkins, Cupp and Schenerlein in Wheeling, West Virginia. These contractors were employers of sheet metal workers and had collective bargaining agreements with Local No. 70. They had been using Burt ventilators. Ringler called their attention to Article (I) of the collective bargaining agreement and told them they were not living up to their agreements. He told them to comply with the agreements.

Ringler furnished to them a list of manufacturers having collective bargaining agreements with sheet metal workers' unions from whom they would purchase their sheet metal products and be in compliance with their agreements.

The International Association maintained a list of its so-called "fair" contractors which it distributed to all of its members and contractors having collective bargaining agreements with it. Burt's name was not on the list.

The purpose of circulating the list was to indicate the names of those manufacturers who were "fair" and those who were not and thus enable workers and contractors to know with whom they could deal and with whom they could not.

Any contractor using Burt products was subjected to the charge by respondents that he was violating the collective bargaining agreement with them and was subjected to threats that respondents

would not supply the employees they were obligated to furnish or permit their members to work and to threats of strikes in some instances.

Burt ventilators were being installed in the Chesapeake Storage Building in Columbus, Ohio, in October 1956. Business Agent Clifton D'Angulo of respondent Local No. 98 went up on the roof of the building and ordered Paul L. Kiefer, a member of said local, who was foreman and three other men to leave the job. He told Kiefer that he was calling a strike and that Kiefer could not work on a job where the ventilators were located as they were non-union and scab since they were made by Burt Manufacturing Company. He was further instructed not to move the ventilators. Kiefer obtained carpenters and laborers to remove the ventilators from the job.

Burt had orders in the summer of 1957 from Tri-States Roofing Company to furnish ventilators for two jobs at Athens, Ohio. One was for the Ohio University, a state institution, and the other for Athens High School. Clark Lessig, Assistant General Manager of Tri-States called Clifton D'Angulo, Business Agent for Local No. 98 in Columbus, on the telephone to ascertain whether the Burt ventilators could be installed on the University job without difficulty. D'Angulo said you have a contract with the union (Local No. 299, Parkersburg, West Va.) and we expect you to live up to it. Lessig then wired the International in Washington inquiring whether he could install the ventilators and received no response. He also attempted without success for two days to reach Edward F. Carlough, General Secretary-Treasurer of the International, on the telephone. He then received a copy of a letter dated December 14, 1956 from the Division of State Architect and Engineer of the State of Ohio to the general contractor indicating that the State wished to avoid all hindrances to the progress of the work and to submit a make of ventilators acceptable to the union if Burt's were not. Lessig then cancelled his order with Burt

for both jobs and installed other ventilators.

Burt had an order from Chrysler Corporation to furnish ventilators for the new Chrysler Stamping Plant at Twinsburg, Ohio, in the fall of 1956. W. O. Frost, Business Agent of Local No. 70 advised the sub-contractor, the Huffman-Wolfe Co. of Columbus, that they would be in violation of their collective bargaining agreement with the union if they installed Burt products and that the job would be struck. This resulted in Chrysler cancelling the order and Burt sold the parts which it had assembled to the Huffman-Wolfe Co. at its costs.

The contract for the construction of the Student Center Building of the University of Akron was awarded in March 1957. The specifications called for Karns ventilators or their equivalent. Karns was not on respondents' list of fair contractors.

The University on June 7, 1957 wrote Conditioned Air, Inc., a sub-contractor of Charleston, West Virginia, stating that as a tax supported institution it was interested in having local suppliers furnish materials and equipment if they met with specification requirements and their prices were equal or less than other bidders from outside the city.

On August 13, 1957 Local No. 70 wrote to Conditioned Air, Inc., requesting that it call at the union office before starting work so that the union could discuss *rules* and working conditions which will govern it while working in union territory.

Because trouble with Local No. 70 was anticipated, the ventilators were eliminated from the contract by the parties.

Guy S. Holsclaw, president of Conditioned Air, Inc., testified as to his difficulty in getting Local No. 70 to supply men as provided in collective bargaining agreement. Frost told him on November 20, 1957 that no men would be supplied until he lived up to the agreement and that all materials would have to be fabricated and installed by members of the International.

A few days later respondent Kenney advised him not to send a foreman to the job as it had not been cleared by the union and the union would not furnish men to unload the materials.

On December 10, 1957 Frost again stated to Holsclaw that the union would not furnish men for the job until it was assured that all sheet metal was manufactured in sheet metal plants; that this applied to Burt as well as other ventilators not made in union shops.

A meeting was finally arranged in Frost's office January 2, 1958 between Holsclaw, Frost and Leslie Hardy, a representative of the University. Frost was asked to explain to Hardy why Conditioned Air, Inc., were unable to proceed. Frost reiterated his previously stated position that men would not be furnished for the job until his union was assured that all sheet metal products were manufactured and installed by his members. Frost suggested that the ventilator contract which had been deleted be reinstated. He furnished a list of acceptable manufacturers.

A few days later the difficulty was resolved when Burt agreed to donate its ventilators to the University. Frost then supplied the workers to the contractor. The construction work was delayed for about sixty days over this dispute.

In May 1957 Alton Page, a business agent of Local No. 65 advised N. W. Nabakowski, a sheet metal employer of about eighty-five workers, who had a collective bargaining agreement that there were sheet metal products considered by the local to be unfair and before Nabakowski signed a contract for the Ford Motor Company project at Lorain, Ohio, he should determine from the mechanical contractor who would purchase these products; that all sheet metal products purchased by Nabakowski should bear the label of Sheet Metal Workers' International Association in accordance with terms of standard agreement in effect between Nabakowski and the association.

A shipment of Burt ventilators consigned to Freyn Bros., Inc., at the Ford Motor Plant in Lima, Ohio, arrived in July 6, 1956. The Sheet Metal Workers employed by the consignee who belonged to Local No. 98 would not unload the car because the material did not bear the union label. Complaint was made by Burt to Secretary of Labor Mitchell who contacted General Secretary-Treasurer Carlough of the International. Sawyer also talked to Carlough, Byron and Bonadio on August 1, 1956. After the car had accumulated demurrage charges for two months, the job was cleared and the ventilators finally unloaded. Mr. Carlough testified that he had instructed Mr. Boggs of the local union to erect any equipment on the job site.

Respondent International called as witnesses Edward Carlough, Frank Bonadio, George Reese and organizers Roberts and Hussey. The local unions called Page, D'Angulo, Frost and Kenney.

The substance of the activities against Burt and its customers were not denied, but the witnesses did deny that the purpose was to organize Burt's workers or to compel Burt to recognize it as its bargaining agent.

George Reese, Director of Organization of the International, testified as to his instructions to organize in connection with the drive for new members which started in 1956. In substance, the instructions were to organize the unorganized and to leave alone plants organized by other unions. Roberts and Hussey corroborated Reese and testified as to their organizational efforts and procedures in this district.

The weekly report of organizer Edwin C. Winter dated February 2, 1958 indicates that with respect to the efforts of the International to organize the workers of Jenn Air Company of Indianapolis, the company was directly approached by the union organizers. The report reads in part that the "Company will handle the employee problem by advising them to join SMWIA. I previously advised him that we must have all their workers if we are to allow them to use our union label."

The pertinent provisions of the Act are:

Section 8(b) (1) (A)

"8(b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: * * * ".

And section 7 is:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."

Sections 8(b) (4) (A), 8(b) (4) (B) and 8(b) (4) (C)

"8(b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) to engage in, or to induce or encourage the employee of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles materials, or commodities or to perform any services, where an object thereof is:

"(A) forcing or requiring any employer * * * or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

"(B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9;

"(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9;"

Section 8(b) (1) (A) of the Act proscribes activities of a labor organization which restrain or coerce an employee in the exercise of a right guaranteed in Section 7.

These guaranteed rights include the right of an employee to join a labor union of his own choice or refrain from joining such union.

In determining whether the activities of the respondents restrain or coerce Burt's employees, the Board has the right to take into account all the facts and circumstances in the case and to draw reasonable inferences therefrom. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; Radio Officers' Union of Commercial Telegrapher's Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455.

The test is whether such activities "were reasonably likely to have restrained the employees' * * * " in the exercise of the right guaranteed to them under Section 7. N. L. R. B. v. Link-Belt Co., supra, 311 U.S. at page 599, 61 S.Ct. at page 366; N. L. R. B. v. Ford, 6 Cir., 170 F.2d 735, 738.

While Link-Belt and Ford involved unfair labor practice of an employer, it is submitted that there is no difference between coercion by an employer and coercion by a labor union. It may be just as effective when applied by either. Capital Service, Inc., v. N. L. R. B., 9 Cir., 204 F. 2d 848, 852.

If the natural effect of the respondents' acts and conduct was to re-

strain or coerce Burt employees in the exercise of their guaranteed rights, then Section 8(b) (1) (A) has been violated.

■ Proof of specific intent is unnecessary where the conduct of the respondents inherently restrains or coerces employees in the exercise of their rights. This is but an application of the common law rule that a man is held to intend the foreseeable consequences of his own act. Radio Officers' Union of Commercial Telegraphers' Union v. N. L. R. B., supra, 347 U.S. at page 45, 74 S.Ct. at page 338.

■ It is not necessary that the union apply the coercion directly on the employee. It may be applied indirectly through others.

As well-stated by the Supreme Court:

"The fact that these various forces at work were subtle rather than direct does not mean that they were none the less effective. Intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge." N. L. R. B. v. Link-Belt Co., supra, 311 U.S. at pages 599, 600, 61 S.Ct. at page 366.

An indirect approach may coerce and restrain just as effectively as one which is direct.

It is of little comfort to an employee to say that he was not directly coerced by a union whose activities were hurting his employer and affecting the security of his job. Nor can it be seriously maintained that an employee whose employer is rendered unable to market the goods produced by the employee because of a union boycott is not seriously affected thereby.

While the acts and conduct of respondents in establishing and enforcing national policy undoubtedly operated to benefit the members of their union, there was a corresponding detriment to the employees of Burt.

If the respondents were to tighten their inspection system and follow all the products of Burt as they left the factory so that Burt had no market therefor, the employees would either go over to respondent International or its Local No. 70 or they would all be out of their jobs.

One thing which stands out in this case which cannot be seriously controverted by respondents is that if Burt's employees were put in the respondent International or its Local No. 70, all of the activities against Burt as shown by the evidence would thereupon cease.

The provisions in the constitution of the International for the establishment of its jurisdictional claims, their inclusion in the standard form of collective bargaining agreement and the method of enforcement as disclosed by the evidence here, are not unrelated to organizational efforts to obtain new members, but form an integral part of them.

It is significant that in the organizational drive which commenced in 1956 that the International published lists of its so-called fair contractors in its official publications which were sent to all the members of its union as well as to employers who had collective bargaining agreements.

It is not possible under the evidence here to separate and divorce all of these activities from organizational efforts to obtain new members.

Respondents claim that their activities were sanctioned by the terms and provisions of collective bargaining agreements entered into with employers and, therefore, cannot be held to be a violation of law.

It is no defense for one who is charged with the commission of an offense to claim that he was acting under a contract with another. The law is supreme. The consequences of violation of law may not be avoided by voluntary acts of individuals.

■ It is, therefore, clear that the practices of respondents are not immunized from Section 8(b) of the Act because of the provisions of the collective bargaining agreements. Local 74, United Brotherhood of Carpenters & Joiners of America v. N. L. R. B., 341 U.S. 707, 713, 71 S.Ct. 966, 95 L.Ed. 1309; N. L.

R. B. v. Local 11, United Brotherhood of Carpenters & Joiners of America, 6 Cir., 242 F.2d 932, 936.

■ The incidents which took place more than six months prior to June 5, 1957, the date on which the original charge was filed, may not be cited as unfair labor practices. 29 U.S.C.A. § 160 (b).

They may be considered by the court only as bearing upon the intent of the respondents and lending credibility to the testimony of petitioner's witnesses as to acts within the statutory period. N. L. R. B. v. Die and Tool Makers' Lodge No. 113, 7 Cir., 231 F.2d 298.

■ There is substantial evidence in the record upon which the Board would have reasonable cause to believe that respondents coerced Burt's employees in the exercise of their rights guaranteed under Section 7; that they applied pressure directly against Burt to persuade Burt to coerce its employees to join respondent International or Local No. 70 and indirectly against Burt by coercing Burt's customers and their employees not to handle or install Burt products.

The instructions given by the International to its organizers in 1956 and 1957 to the effect that they should organize the unorganized and not attempt to organize plants already organized by another union do not throw much light on the controversy here.

The issue cannot be determined by the manner in which respondents organized other plants. The question is, what did they do here?

The views herein expressed are in accord with recent decisions of the National Labor Relations Board. Curtis Brothers, Inc. (1957), 41 L.R.R.M. 1025; Alloy Manufacturing Co. (1957), 41 L.R.R.M. 1058; Ruffalo's Trucking Service, Inc. (1958), 41 L.R.R.M. 1270.

■ The remaining issue in the case is whether the activities of respondents violated Sections 8(b) (4) (A), 8(b) (4) (B) and 8(b) (4) (C) which are commonly known as the boycott sections of the Act.

The words "induce or encourage" in Section 8(b) (4) (A) have been construed by the Supreme Court as "broad enough to include in them every form of influence and persuasion." International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 341 U.S. 694, 701, 71 S.Ct. 954, 958, 95 L.Ed. 1299.

In Joliet Contractors Association v. N. L. R. B., 7 Cir., 202 F.2d 606, the court in holding that the union by-laws there under consideration, which were no less severe than the constitution of the International here, said at page 611:

"These by-laws constitute more than an inducement or encouragement to its members. They are a command both to refuse employment where preglazed sash is used and to cease work when its use is discovered, and a Union member is subject to penalty if he neglects or refuses to comply with this Union edict. We think it borders on the absurd to reason that this encouragement or inducement element is present only when an agent of the Union informs or calls to the attention of the member what the by-laws require. Certainly the members know what the by-laws require and they have no choice but to refuse to work when discovery is made that preglazed sash is being used."

The acts and conduct of Local No. 70 in respect to the Ohio Bell Telephone Company job in Akron in June 1957 involving employees of Wooster Sheet Metal have been related.

On October 27, 1957 during the progress of the work on a Cleveland Recreation Center job, Clarence Desch, Business Representative of Local No. 65 contacted Melvin Albert, a member of his union who was job foreman relative to the ventilators on the job. He asked Albert if he knew what kind of ventilators were involved and Albert replied he did not know. They went up on the roof and examined them. Desch told Albert that the

ventilators looked like Burt's. He told Albert that until it was determined what kind of ventilators were on the job, if there was other work, he should do it, Desch also talked to the Field Superintendent Wilbur D. Quada and to John T. Mannon of Mannon & Roth, contractors.

Mannon testified that Desch had informed Albert to lay off installing the vents until they had some answer and that he also asked the field representative not to install them and to convey the message to the President of Mannon & Roth that they were in violation of their agreement with the union. Mannon told Albert he did not want him to get into trouble with his union. Two or three weeks later Desch released the job. The men, who had been taken off the job to work on another contract, returned and installed the ventilators. Because of Albert's position with the union and with the company, it is not unreasonable to presume that he contacted his fellow employees as well as his employer and informed them of Desch's instructions in the matter to handle other work until the the make of the ventilators on the job had been ascertained.

The policy of respondents as set forth in the constitution of the International and adopted in the standard form of collective bargaining agreement was binding upon both employee and employer. These documents were calculated to and did operate as an inducement or encouragement to the employees to engage in concerted activities within the proscription of Section 8(b) of the Act. Joliet Contractors Association v. N. L. R. B., supra.

The spark was ignited whenever the employees were told or found out that forbidden products were being used.

It was further argued that petitioner was tardy in not asserting his rights to injunctive relief promptly after the charge was filed.

The rules governing in private litigation are not applicable here.

In this case the injunction is sought by an agency of the Government "for the protection of the public interest and in aid of a policy which Congress itself has made plain." Brown v. Pacific Telephone & Telegraph Company, 9 Cir., 218 F.2d 542, 544, 545.

■■■■ No laches of a public servant can bar relief in this type of a case.

It was estimated that it would take about one year to process this case before the Board.

The charge in this case is not the only one pending before the Board and there was no showing here that it will not receive prompt attention. If there is any unreasonable delay, it may be reported to the Court.

It is unfortunate that the two labor unions involved in the prolonged and bitter jurisdictional controversy in this case could not have adjusted their differences within established union procedures without the intervention of a court, particularly since they are now both affiliated with AFL-CIO.

It is believed to be not only in the public interest, but in the interest of all of the parties that hostilities cease while the charge is being determined by the Board in a calm and dispassionate atmosphere.

The Court finds that there is reasonable cause to believe that the charge is true.

This memorandum is adopted by the Court as findings of fact and conclusions of law. An order may be drawn granting a preliminary injunction as prayed for which should be submitted to all counsel for approval.