**SEARS, ROEBUCK AND COMPANY,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 21010.**

United States Court of Appeals,
Sixth Circuit.

Oct. 13, 1971.

---

Philip C. Lederer, Chicago, Ill., Lawrence M. Cohen, Herbert M. Berman, Lederer, Fox & Grove, Chicago, Ill., Avern Cohn, Honigman, Miller, Swartz & Cohn, Detroit, Mich., Gerard C. Smetana, Chicago, Ill., on the brief; Roy E. Browne, Hershey, Browne, Wilson, Steel, Cook & Wolfe, Akron, Ohio, of counsel, for petitioner.

Ronald I. Tish, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Charles N. Steele, Atty., N. L. R. B., Washington, D. C., on the brief, for respondent.

Before WEICK and BROOKS, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

Sears, Roebuck & Company petitions for review and denial of enforcement of an order of the National Labor Relations Board, entered May 18, 1970, finding Sears guilty of violating Section 8(a) (1) of the National Labor Relations Act. The Board asks us to enforce the order.

We deny enforcement.

Sears opened a store in Livonia, Michigan, in the fall of 1964. By 1968 it employed some 1200 people, 35 of whom made up the shipping and receiving department. On December 31, 1968, a Local of the Teamsters Union sent a telegram to the manager of the Livonia store, Arthur Cone, demanding recognition of the Teamsters as the bargaining representative for the 35 employees in the mentioned department. On January 13, 1969, it filed a petition for a representation election. On April 1, 1969, a Decision and Direction of Election announced that the shipping and receiving department was not an appropriate unit for a representation election. Thus, the matter now before us would not likely have had a beginning except for its sua sponte initiation by the Regional Director.

Moreover, and except that one employee testified that he had signed a union card, the Regional Director authorized this proceeding without reference to any disclosed desire of the involved employees of Sears' Livonia store to be represented by the Teamsters or any other union. The Teamsters' wire was dated December 31, 1968, and the Decision and Direction of Election declaring the unit inappropriate as a bargaining unit was issued April 1, 1969. Between those dates no charge of an unfair labor practice involving Sears' Livonia store was filed by any representative of the Teamsters, by any employee of the involved Sears unit, or by anyone else.

On April 3, 1969, however, a form of Charge Against Employer was prepared for, and signed by, one Robert S. Sherman, an employee of Sears shipping and receiving department. He was described in the Trial Examiner's Decision as a "quick tempered, disgruntled employee,

eager to impugn the Company's motives." The charge made by Sherman was foreign to the matter now involved. No Complaint was issued on it, and the Trial Examiner concluded that General Counsel abandoned Sherman's charge.

Nevertheless, on May 27, 1969, and without any additional charge being made, the Regional Director at Detroit, Michigan, issued a Complaint and Notice of Hearing against Sears. Although it begins with the averment that "It having been charged by Robert S. Sherman," nothing is mentioned as to the above quoted charge of Sherman. In five of the fifteen numbered paragraphs, the Complaint details various actions by Sears' representatives which it is claimed interfered with rights of the employees protected by Section 7 of the Act. None of these charges were detailed in Sherman's charge, nor in any other charge filed by anyone against Sears. We assume, therefore, that they were the product of the Regional Director's own investigation.

A hearing was conducted at Detroit on dates between June 23 and July 1, 1969, and the Trial Examiner's Decision was issued on October 21, 1969. On May 17, 1970, the Board affirmed the Trial Examiner's Decision and adopted as its own his Recommended Order. The Recommended Order commands Sears to post at its Livonia store a Notice to Employees. This notice amounts to a public confession of misconduct. It reads as follows:

### "NOTICE TO EMPLOYEES.

Posted by Order of the
National Labor Relations Board
An Agency of the United States
Government

"We Will Not question or solicit you as to complaints and grievances regarding working conditions, nor shall we correct working conditions complained about, in order to interfere with your choice of bargaining representative, or so as to induce you to reject and refrain from activities in support of Local 299, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Ind., or any other labor organization. However, this will not affect benefits or corrected working conditions heretofore put into effect.

"We Will Not in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you in Section 7 of the National Labor Relations Act."

All of these proceedings have produced a 404 page appendix. The alleged misconduct of Sears which precipitated this now extensive proceeding consisted primarily of Sears' attempt, after receiving a wire from the Teamsters Union, to find out whether it was indicative of a decline in the morale of its employees and, if so, the cause thereof. What was done by Sears was but a continuance—more aggressively pursued, perhaps—of what had long been its policy of seeking and maintaining good relationships with its employees. Admittedly, the union's demand enhanced the company's relevant activity, and the conduct which seemed most to impress the Trial Examiner was the bringing from Chicago of a Sears assistant employee relations man—one Allen—and a personnel staff assistant—one Bennett. While these men had not visited the recently established Livonia store, their activities there were of the same kind as they had conducted at various other stores. The Trial Examiner's own generalized description of the basis of his finding recites:

"On December 31, 1968, the Union sent a telegram to Store Manager Cone, demanding recognition as exclusive bargaining representative for certain employees, including the shipping and receiving employees directly involved here. After Respondent declined recognition, the Union on January 13 filed a petition for an election with the Board's Regional Director.

"Cone testified that 'within the hour after receiving the Union's telegram'

for recognition he telephoned Respondent's main personnel (Midwestern Territory) office in Chicago to discuss the Union's demand. Cone spoke to the head of that department (Robinson), the assistant employee relations manager (Allen), and the personnel staff assistant (Bennett). According to Cone, 'My major concern was with the morale, and the request for the recognition at best gave indications that there might be problems there—morale problems—that I needed to evaluate.' Allen, whom Cone described as especially equipped 'in matters of taking a reading on the morale,' testified that he agreed 'to come into the store to assist him [Cone] in communicating with the employees * * * and to advise him of matters related to personnel,' indicating that he, too, was 'concerned with employee morale' since 'a demand for recognition can mean morale problems in some cases.'

"Allen arrived at the store on January 6 and 'talked a great deal with Mr. Cone' and the supervisory staff in his first 5-day visit. He told them that 'there were certain actions, as supervisors, that they should guard against,' including threats and promises to employees; and he promised to 'try to keep the supervisors informed as to what was taking place, and * * * would also communicate what was taking place to the employees in the store.'

"Allen returned to the store the following week (January 13–15), as well as on January 29–31, February 4–7, March 5 or 6, and April 3. Admittedly, he never previously visited the store, explaining, 'I was never informed of any morale problem' or other problems. Allen testified that he would circulate among employees in the shipping and receiving department, introducing himself as 'Greg Allen out of the Personnel Department from Chicago,' inform them of the Union's recognition demand, and ask 'how things were going, how they were getting along, or what their job was, what they were doing.' According to Allen, 'whenever the employee had finished with whatever he wanted to talk about [he] just thanked him and walked away,' in each case volunteering that he 'was not interested in their feelings about the union * * * one way or another.' These conversations, confined to the shipping and receiving employees 'amongst' whom the Union claimed recognition, took place at or around the employees' work area, close to other working employees.

"Allen further testified that as a result of these conversations he became aware of 'a lot of various complaints' since the employees told him 'of many problems.' According to Allen, he never informed any employee 'that I was there to rectify complaints,' nor that he was going to report the grievances. However, he in fact reported these complaints to Cone or Operating Superintendent Sheer, and 'in some cases' Cone told him what, if anything, he had done regarding them.

"Personnel Staff Assistant Bennett of the Midwestern (Chicago) Personnel Department also visited the Livonia store during the weeks of January 4 and 13. He, like Allen, had never previously visited that store. Bennett testified that his supervisor in Chicago (Robinson) 'indicated to me he felt there were some morale problems in the Livonia store, and he asked me to visit the store to evaluate if there were morale problems.' Like Allen, Bennett expressed the view that 'an employee's concern and interest' in unionism 'could be' a 'reflection of a morale problem'; and he 'specifically did not visit the Livonia store in the past because [he] felt there were no serious morale problems.' Bennett reported to Robinson his finding 'that some of our employees had indicated to me dissatisfaction with some parts of their work.' He testified that he probably also made a report to Store Manager Cone."

There was evidence that supervisory people were in the habit of making frequent inquiries of employees as to how things were going, alert to discover justified dissatisfaction. Each new employee of Sears was given a booklet called "Getting Acquainted With Sears." Under a paragraph entitled "Opportunity to Express Yourself," employees were invited to take up their problems with supervision. They were told:

"There may be times when you want advice on a problem or an answer to a question. Usually, your immediate supervisor will be able to help you. If not, feel free to take your problem to somebody else—the personnel department, for example. In some locations, there may not be a designated personnel department, but the store manager, assistant manager, or supervisor will help you in every way possible. Any matters you wish to discuss will be considered confidential and will be handled impartially."

One employee, upon inquiry by the Chicago man as to how things were going, complained that he had not had a promotion in five years. This was reported to the Livonia supervision, and after an investigation, the employee was given a job in selling which was more to his liking. There is no evidence that this employee had ever complained to a supervisor or requested a change of job. Other alleged misconduct by Sears consisted in improving working conditions such as better lighting, providing a lift hoist, better heating, more protective clothing and adding one man to the work force on the loading dock. The evidence showed that some of the corrections and changes had already been scheduled, some were seasonal, and others were the product of fresh suggestions from employees. The trial examiner observed:

"Respondent adduced evidence purporting to show that maintenance of equipment throughout the store was a continuing practice. Store Manager Cone testified that equipment installed when the store opened (Fall 1964) was being replaced or repaired 'with increasing frequency' and new equipment was being added 'because of the rapid growth of business.' Cone's testimony is supported by Company records, including budgets for capital and maintenance expenditures.

"Cone testified on various improvements made before advent of the Union as a result of suggestions and complaints by employees as well as managerial officials. Thus, as a result of 'a congested, cramped operation causing complaints of the employees,' he had 'doubled the size' of the receiving office in 1965 and he enlarged it again in 1968. Similar complaints regarding 'overcrowded conditions' and 'inability to move merchandise' from the dock to stockroom led him in 1968 to a decision to enlarge that facility. Facilities other than the shipping and receiving department here directly involved were remodeled, revamped, or refurnished in early 1969—including retail division 4265 (plumbing, heating, and kitchen-planning), men's store, women's and children's shoes, girls' department, male employees' lounge, and major appliances—some prompted by 'expressed dissatisfaction' of employees, others by business growth, and still others by 'development of new ways for presenting merchandise.'

"Cone testified that in the past he learned of employee 'problems' through his operating superintendent (Sheer) and other supervisors in daily contact with employees, as well as from employees directly while walking through the store. Employee Pike testified that 'You could just go upstairs and ask to see Mr. Sheer or Mr. Cone and tell them your complaints,' but Pike later qualified this by stating that he 'just assumed this.' Employee Smith indicated that in the 5 years he had been with the Company no management representative or supervisor ever approached him 'to solicit' complaints, prior to Allen's ques-

tioning following the advent of the Union. Sherman, who had worked for the Company for about 5 years and Graczyk a total of about 3 years, testified to the same effect."

There was no evidence that the complaints and suggestions made to the Chicago personnel people had ever been made to a supervisor at Livonia. Most of the complaints to the Chicago people were not acted on; no changes in wages were made. The trial examiner said:

"Allen testified that many of the employee complaints and problems raised in his conversations were not acted upon by management. Among these were alleged low wages and method of handling merit wage increases; Saturday overtime; fully paid hospitalization and maternity benefits; insufficient help in the supply room, customer pickup desk, and on trucks; onerous or unsavory duties such as unloading tires and portering; and condition of facilities, such as slippery dock surface and no lock on a marking ticket cabinet."

The record before us does not disclose that Sears had any history of anti-unionism. Upon review of the record we find that only one employee had signed a union card and out of the remaining employees in the involved department only Sherman appears to have been interested in the Teamsters Union. Further there is no evidence that any of the persons who made complaints which were satisfied by supervision were union protagonists or that the action taken by Sears was anything other than designed to promote good relations with its people or was unprecedented.

The trial examiner's conclusion was that the company sought to "persuade employees to *abandon support for the Union.*" The record does not indicate that there was any "support for the Union" in the department involved. The examiner goes on to say that what Sears "could and did reasonably lead *dissatisfied* employees to conclude that but for the Union drive complaints would have remained unalleviated." This is gratuitous and without evidentiary support. The examiner further said:

"For like reasons I do not regard as decisive the circumstance that General Counsel's evidence on the unlawful conduct is confined to the shipping and receiving employees and does not extend to the automotive and maintenance departments in which the Union also sought representation. *The fact is that the shipping and receiving department was the object of the Union's organizational drive.* For aught that appears, the Union supporters were concentrated in that department, the conditions there lent themselves to correction more readily than in other departments, and Respondent was more concerned about organization of the shipping and receiving employees than of others." (Emphasis supplied.)

■ Except for a telegram and petition asking for an election and bargaining rights there is no evidence of any "organizational drive." The words "[f]or aught that appears" seems to imply that the company had to negative facts that *might, but did not, appear* in the evidence. The General Counsel has the initial burden of proving the charges made. N. L. R. B. v. Murray Ohio Co., 6 Cir., 326 F.2d 509. We there said:

"The burden was on the general counsel to prove its case against defendant by a preponderance of the evidence. N. L. R. B. v. Cleveland Trust Co., 214 F.2d 95, 99 (CA 6, 1954); Lawson Milk Co. v. N. L. R. B., 317 F.2d 756, 760 (CA 6, 1963). This burden, of course, may be met by drawing legitimate inferences from established facts and it is the Board's exclusive province to make such legitimate inferences. N. L. R. B. v. Wiltse, 188 F.2d 917, 925 (CA 6, 1951); N. L. R. B. v. Ford, 170 F.2d 735, 739 (CA 6, 1948); N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368, 378; N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 107, 62 S.Ct. 690, 86 L.Ed. 1305,

1307. But the Board's power to draw inferences is not beyond all judicial control, and upon the courts is cast the responsibility of determining whether a Board finding of fact, based on inference or otherwise, is supported by substantial evidence, when viewed on the record as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456." 326 F.2d at 513.

There can, of course, be situations where proof of certain facts cast the burden upon the employer of going forward with opposing evidence. N. L. R. B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

This is not such a case, and the Supreme Court there concluded:

"But where, as here, the tendency to discourage union membership is comparatively slight, and the employers' conduct is reasonably adapted to achieve legitimate business ends or to deal with business exigencies, we enter into an area *where the improper motivation of the employers must be established by independent evidence.* When so established, antiunion motivation will convert an otherwise ordinary business act into an unfair labor practice. National Labor Relations Board v. Erie Resistor Corp., *supra,* 373 U.S. [221] at 227, 83 S.Ct. 1139 [10 L.Ed.2d 308], and cases there cited." 380 U.S. at 287–288, 85 S.Ct. at 986. (Emphasis supplied.)

■■■ A telegram from the Teamsters, or other union, demanding bargaining rights, would indeed suggest to an employer the possible impairment of its own good relations with its employees. We are not persuaded that from that moment on the employer must desist from any effort to find out whether there is a morale problem. The management did nothing to suggest to its employees that a union would be unwelcome, and its representatives made clear that joining a union was their own

affair. There is no evidence from which a legitimate inference could be drawn that reprisals would be visited upon anyone for union activity. It would be intolerable if an employer, from the moment of a union demand for bargaining rights, would be required to desist from making. corrections needed to be made. There is no evidence to support an inference that but for the union's telegram the employer Sears would have left uncorrected anything that needed correction. It would be grossly violative of the rule of *Universal Camera* to allow the General Counsel to hypothesize a case without evidentiary support and then ask an employer to overcome the unsupported hypothesis. The Board's findings are not supported by substantial evidence.

Enforcement is denied.